**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| COMMISSIONING AGENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT G. LONG, Individually; | ) | |
| | ) | |
| HUGH GENERAL MANAGEMENT, LLC, | ) | Civil Action No. 1:15-cv-62-TWP- |
| d/b/a HUGHCX d/b/a HUGHGM; | ) | DKL |
| | ) | |
| HUGHCX, LLC, d/b/a HUGHGM d/b/a | ) | |
| HUGH GENERAL MANAGEMENT; and | ) | |
| | ) | |
| MISSION CRITICAL COMMISSIONING, LLC | ) | |
| d/b/a HUGHGM d/b/a HUGHCX | ) | |
| d/b/a HUGH GENERAL MANAGEMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES,
INJUNCTIVE RELIEF, AND JURY DEMAND**

Plaintiff, Commissioning Agents, Inc. ("CAI"), by counsel, and for its First Amended

Complaint for Damages, Injunctive Relief, and Jury Demand against Defendants, Robert G.

Long ("Long"), Hugh General Management, LLC ("HughGM"), HughCx, LLC ("HughCx"),

and Mission Critical Commissioning, LLC ("MCC"), alleges and states as follows:

### I.    Introduction

1.    Defendant Long lied to, defrauded, and stole from CAI, his employer, for the

benefit of himself and CAI's competitors.  While creating the impression of working for CAI

through false timesheets and expense reports, Long was secretly an employee or a principal of

several of CAI's competitors.  Long spent time that should have been devoted to advancing CAI's interests to advancing the interests of a competitor, HughGM, of which Long was a part owner and principal.  Long stole CAI's confidential and proprietary materials, funneled them to HughGM, and exploited CAI's property and proprietary information to divert corporate opportunities from CAI and to pitch work for HughGM and to perform HughGM work.  Upon information and belief, Long's HughGM partners knew about, approved, and encouraged his actions and knowingly received the benefits of Long's lies, fraud, and theft.

2.     CAI terminated Long immediately upon discovering his fraudulent, illegal schemes.  CAI now files this action to stop Long and HughGM from illegally using CAI proprietary materials and to seek redress for the harm it has suffered.

## II.     Parties, Jurisdiction, and Venue

3.     Paragraphs 1-2 are incorporated herein by reference.

4.     CAI is an Indiana corporation with its principal place of business in Marion County, Indiana.

5.     Long is an individual and a resident of King County, Washington.

6.     Until August 2014, Long was a regular employee of CAI.

7.     HughGM is a Washington (state) limited liability company ("LLC") with its principal place of business in King County, Washington.

8.     HughGM is registered with the Washington Secretary of State, under this address: 601 Union Street, #4200, Seattle, WA 98101.  HughGM was formed and first registered on March 21, 2006.  Its registered agent is George H. Amburn, Jr. ("Amburn"), an individual and resident of King County, Washington.

9.     HughCx is a Washington (state) LLC with its principal place of business in King County, Washington.

2

10.     HughCx is registered with the Washington Secretary of State, under the same address as HughGM.  Its registered agent is HughGM.  It was first registered on October 1, 2014.

11.     Upon information and belief, HughCx was created very recently (shortly after Defendant Long learned that Plaintiff CAI had discovered the illegal conduct described below) in an attempt (A) to create confusion between itself and HughGM, and (B) to shield its registered agent, HughGM, and HughGM's principals and shareholders, from liability to CAI for claims arising from the events described in this Complaint.

12.     Throughout the relevant time period set forth below, HughGM and its authorized agents referred to HughGM as both "HughGM" and "HughCx," simultaneously and interchangeably.  Upon information and belief, CAI understands the actions described below to be primarily attributable to HughGM, regardless of what name it may use.  For this reason, and because of the confusion of these corporate identities, this Complaint henceforth refers to both entities collectively as "HughGM."  All references below to HughGM apply equally to HughCx.

13.     Long is a principal and shareholder of HughGM.

14.     Amburn is a principal and shareholder of HughGM.

15.     MCC is a Nevada LLC with no discernible principal place of business.

16.     MCC is registered with the Nevada Secretary of State, with no office address listed.  Its entry on the Secretary of State's website indicates that its registered agent is Corp 95, LLC ("Corp 95"), located at 2620 Regatta Drive, Suite 102, Las Vegas, Nevada, 89128, and that it has an "officer" listed as Pyramid Management, LLC ("Pyramid"), located at 32565B Golden Lantern Street, Suite 140, Dana Point, California, 92629.  Its "file date" is February 8, 2012.  See Exhibit 1.

17.     Upon information and belief, Corp 95 has no genuine role within MCC, and is simply a service that specializes in helping individuals form Nevada corporations anonymously. See Exhibit 2 (Corp 95 website excerpts: "You can form a Nevada LLC or corporation and set up banking without actually going to Nevada . . . . Anonymous entity where *your name is not on any public document!*") (emphasis in original).  Upon information and belief, Pyramid similarly has no genuine role within MCC, and is simply a Nevada shell corporation that Corp 95 has listed as an "officer" of MCC and of several other anonymously run companies that it has helped to register.  See Exhibit 3 (CorporationWiki website entry for search of Pyramid, illustrating its connection to other companies: http://www.corporationwiki.com/p/2bsajj/pyramid-management-llc); Exhibit 4 (Nevada Secretary of State entries for same corporations, all with Corp 95 as registered agent and Pyramid as officer).

18.     Upon information and belief, MCC has done little or no business in Nevada, and Long attempted to use Nevada's unique corporate laws to hide his involvement in MCC and to shield himself from liability for the acts described below.   See Exhibit 5 (Long email correspondence with Corp 95: "I would like to keep my name off public records") (credit card information redacted to protect Long's personal financial information).

19.     Upon information and belief, MCC at some point ceased operations and became absorbed into and subsumed by HughGM via a merger, acquisition, or some other means. Again, upon information and belief, CAI understands the actions described below to be primarily attributable to HughGM, but does not know what role, if any, MCC may have played in these actions.  This is especially so given Long's efforts to conceal his involvement in MCC and to create confusion as to its existence, status, and role within HughGM.  Accordingly: (A) CAI names MCC as a Defendant here, and is entitled to discovery to determine the nature of that role;

4

and (B) this Complaint henceforth considers MCC to be a part of HughGM, and all below references to and allegations of HughGM's unlawful or tortious conduct apply equally to MCC.

20.     CAI originally filed this action in Marion County (Indiana) Circuit/Superior Court.  Defendants Long and MCC then removed this action to this Court.  Dkt. No. 1.  Without expressing any opinion on the truth or accuracy of the contents of Defendants' Jurisdictional Statement (Dkt. No. 24), CAI consents to federal subject matter jurisdiction.

21.     Venue in this Court is proper under 28 U.S.C. § 1391, and personal jurisdiction is proper in this Court under the Indiana Trial Rules and the United States Constitution, for the following independent reasons: (a) a substantial part of the property that is the subject of the action is situated in (and/or taken by Defendants from) Marion County, Indiana; (b) a substantial part of the events giving rise to the claim occurred in Marion County, Indiana; (c) Defendants intentionally directed activity to Marion County, Indiana; (d) Defendants' relationships, dealings, and/or contacts with Indiana residents and corporations create proper venue and personal jurisdiction in this Court; and/or (e) the laws of the United States otherwise provide for personal jurisdiction and venue in this Court.

### III.     Factual Background

22.     Paragraphs 1-21 are incorporated herein by reference.

23.     CAI is in the business of providing commissioning services ("Commissioning Services") for firms that have a need for such services ("Clients").  Commissioning Services are consulting, engineering, and design services that ensure that a building or similar facility is constructed to fit its intended purpose and that it operates accordingly.  *See* Exhibit 6.

24.     Like CAI, HughGM is (and MCC was) in the business of providing Commissioning Services for corporate Clients.

25. The commissioning industry bears some similarity to the construction industry. Clients will put a project up for bid, sending out "requests for proposals" ("RFPs") to certain qualified commissioning firms. Those firms will prepare a detailed proposal. Clients award the business to the commissioning firm most suited to perform the work required, based on the pricing information and technical ability manifest in that firm's proposal. The commissioning firm hired to do the work will then be responsible for ensuring that the work is completed in full, according to project specifications, and on time. Because of the similarities and necessary integration between Commissioning Services and construction services, commissioning firms and construction firms will sometimes partner with one another to prepare a joint proposal.

26. Commissioning Clients usually do not advertise publicly when they have a need for Commissioning Services. Instead, a Client typically announces these needs only to those firms with whom it has a prior relationship, or who have a strong reputation for quality work. Commissioning firms therefore invest ample resources in cultivating strong relationships with prospective Clients and in building a strong reputation through consistent, excellent work.

**A.    Long Begins Employment with CAI.**

27. Long completed a CAI employment application on or about November 8, 2012. *See* Exhibit 7. Upon information and belief, Long's application contained numerous falsified letters of recommendation and material false representations regarding issues such as his skills, experience, employment history, and criminal history. Among other such misrepresentations, the application asserted that Long's only employment since 2001 was through a sole proprietorship called ELW LLP—while, as explained below, he held numerous commissioning positions with other firms (including his apparent additional sole proprietorship, MCC) in this time period and at the time of application. This misrepresentation prevented CAI from running a

check of past and current employment, the results of which would have caused CAI to reject his application.  Long's application further included an explanation of a past criminal charge which contained many representations which, upon information and belief, were false and/or misleading.  For example, it explained that a purchase of the drug human growth hormone from overseas was due to a one-time sports injury that briefly clouded his judgment, from which he had "learned [his] lesson"; however, files and emails stored in his CAI computer strongly suggest that Long continued to purchase and abuse anabolic steroids and similar illicit substances during his employment at CAI.  Despite these and other misrepresentations, Long signed his employment application, explicitly certifying that the contents were true, correct, and complete.

28.     Relying on the contents of his application, CAI extended a formal employment offer to Long on or about December 6, 2012.  By the offer's terms, CAI would provide: (1) compensation of $39 per hour, plus overtime, which together provided an opportunity for Long to earn over $100,000 per year, depending on the number of hours he worked; (2) reimbursement of expenses incurred pursuant to travel that CAI might require for CAI work; and (3) other benefits such as paid vacation, medical insurance, company-funded retirement contributions, and a 401(k) savings plan.  *See* Exhibit 8.

29.     Long accepted CAI's employment offer, and began his employment at CAI on or about December 10, 2012.

30.     Upon beginning employment, Long signed an employment agreement ("Employment Agreement") with CAI.  *See* Exhibit 9.  It read in part:

> **Confidential Information[:]** I am aware that during the course of my employment confidential information will be made available to me, for instance, product designs, employee/employment information, wage and salary data, marketing strategies, customer and employee lists, pricing policies and other related information.  I understand that this information is proprietary and critical

to the success of [CAI] and must not be given out or used outside of [CAI]'s premises or with non-[CAI] employees.   In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

31.     Per discussions between CAI and Long, Long was to work full-time for CAI, and base his operations on behalf of CAI in the greater Seattle area (where he already lived).  His work would cover commissioning projects located in the Pacific Northwest and Silicon Valley regions of the United States.  These were regions in which CAI already had some commissioning business, but wished to grow its presence.  Long was hired to effectuate that growth and to service CAI's existing Clients, including specifically to help win and service Microsoft as a major client.

**B.     Long Seeks and Obtains Employment with or Ownership in Other Companies.**

32.     Upon information and belief, Long became a shareholder and principal of HughGM at some point before the beginning of his employment at CAI.  Thereafter, Long was given a HughGM email address, and his picture, name, and title appeared under the heading "Our Principals" on the "About" page of HughGM's website.  *See* Exhibit 10.  For these and other reasons, Long had actual and apparent authority to act on behalf of and to bind HughGM. Accordingly, Plaintiff hereby alleges that the actions of Defendant Long described below were taken both in his individual capacity and in his capacity as a principal of HughGM, and that they were taken only to advance Long's personal interests and the interests of HughGM, and not those of CAI.

33.     Upon information and belief, when Long became a shareholder and principal of HughGM, one or both of two other companies owned by Long, ELW LLP and Defendant MCC (the "Predecessor Entities"), ceased operations and became absorbed into and subsumed by

HughGM via a merger, acquisition, or some other means. After diligent search and investigation, Plaintiff cannot find any public record of ELW LLP as a presently active business entity. Although (as discussed above) MCC is registered as an active Nevada corporation, upon information and belief MCC no longer conducts any operations and has been wholly subsumed by HughGM.

34.     Upon information and belief, Long had associated and conducted business with HughGM and its agents (such as Amburn and Robert Evans), and was given authority to act on behalf of HughGM—in his individual capacity and in his capacity as a principal of one of the Predecessor Entities—long before officially becoming a principal of HughGM, and before beginning employment at CAI. Upon information and belief, Long is the sole principal and owner of MCC (to the extent it still exists) and was so before beginning employment at CAI, and thus at all times has had authority to act on behalf of MCC. This conduct and authority (pertaining to both HughGM and MCC) also has continued beyond Long's termination from CAI. The actions alleged below therefore include but also precede and outlast Long's employment at CAI.

35.     Long sought and obtained employment with CAI for two purposes: (1) to enrich himself by collecting wages from CAI; and (2) to use CAI's proprietary information—including but not limited to CAI trade secrets, work product, proposals, processes, reports, designs, specifications, employee lists, pricing policies, Client RFPs, Client contact information, Clients' confidential information, knowledge of upcoming business opportunities, and other physical materials and intellectual property (collectively, the "Proprietary Materials")—in an effort to divert business away from CAI and to HughGM or the Predecessor Entities.

36.     Such was Long's *modus opperandi*—upon information and belief, during his employment at CAI, Long was employed by at least four other commissioning companies, not including HughGM and the Predecessor Entities, and was hired as a consultant by yet two other commissioning firms.  All of these firms are direct and/or indirect competitors of CAI.

37.     At no point prior to terminating Long in August 2014 did CAI have any knowledge of or reason to know of Long's involvement with these other entities.  CAI understood—and Long knew that CAI understood, and purposefully caused CAI to believe—that CAI was Long's exclusive employer, and that Long's work in the field of commissioning was strictly limited to his work for CAI.

38.     Long collected these multiple salaries to support his lavish lifestyle, which upon information and belief included expenses such as a house worth nearly $1 million, international vacations, a personal trainer, and a regimen of internet-purchased exotic foods and recreational substances, such as human growth hormone and anabolic steroids.

**C.      Long Steals Business Opportunities from CAI.**

39.     Shortly after joining CAI and throughout his tenure there, Long (in his capacity as a principal of HughGM) pursued business opportunities for HughGM that he learned about solely by virtue of his employment with CAI.  As a CAI employee, Long had access to CAI's Proprietary Materials, and used them to learn about and pursue project opportunities and other Client business for himself and HughGM, about which neither Long nor HughGM would have known, but for Long's access to the Proprietary Materials.  These included, but were not limited to, Clients and projects where Long knew that CAI already had an established contractual or similar business relationship.  He used this information in this way despite his promise in the Employment Agreement that he would not do so.

40.     Throughout his tenure at CAI, Long also learned of other such opportunities by conducting extensive research and leveraging personal contacts.  CAI hired Long to do exactly this work, in order to find new opportunities for CAI and to grow CAI's business.  However, instead of informing his CAI superiors about these opportunities and pursuing them for CAI, Long pursued the opportunities exclusively for HughGM.  For the vast majority of these project opportunities, CAI (A) had the capacity to perform and earn substantial revenue from the work, and (B) knew of the opportunity and had active interest, or would have had active interest if it had known about the opportunity.  Long knew or should have known about CAI's active and potential interest in, and ability to capitalize on, these opportunities.

41.     Even in the few instances where Long actually informed his CAI superiors of such opportunities (which CAI pursued, or communicated to Long that it had interest in pursuing), Long and HughGM pursued the same opportunities, in direct competition with CAI. In no instance did Long request CAI's permission to pursue such opportunities for non-CAI purposes, and such permission would not have been granted.

**D.     Long Misappropriates CAI Proprietary Materials for Personal Gain.**

42.     In addition to using CAI's Proprietary Materials to learn about and steal business opportunities, Long regularly misappropriated CAI Proprietary Materials and used them as part of HughGM's actual bids and project work.  He did so in several ways.  For example, Long regularly disseminated this information to his partners at HughGM, and to other entities in the commissioning marketplace.  In the latter instance, Long passed off the material as having been created by HughGM.  Long's purpose was to give a competitive edge to HughGM by using CAI's work product, contacts, reputation, and goodwill, into which CAI had invested significant

resources.   As above, Long used the Proprietary Materials despite his promise in the Employment Agreement that he would not do so.

43.    For example, in several instances, at Long's direction, HughGM submitted to prospective Clients detailed proposals for Commissioning Services that were near-verbatim proposals that CAI had submitted for similar projects.  Indeed, the only apparent changes that Long or HughGM made to the CAI proposals were changes to the Client name and replacing the CAI logo with a HughGM logo (which he occasionally forgot to do).  In one such instance, on a large and lucrative project for a Fortune 100 Client that would have been ideal business for CAI, Long's misappropriated CAI proposal won the project for HughGM.

44.    In addition, upon information and belief, Long has included items in his personal resume that are in fact experience elements of other CAI employees performed for current CAI customers, and Long wholly fabricated a letter of recommendation from CAI (dating from months before his employment at CAI began, when Long did no work whatsoever with CAI; it contained the name of a fairly junior CAI employee who resided in the United Kingdom, yet had a Seattle phone number not known to CAI) and has used the letter to attempt to induce prospective Clients to hire HughGM.  *See* Exhibit 11; *compare*, *e.g.*, Exhibit 12 at 2-4 (resume of CAI project manager Nathan Temple; bullet points under heading "Genentech S. San Francisco, CA," and "Training" bullets beginning with "ISPE-") *with* Exhibit 13 at 2, 4 (Long resume stored on Long's CAI laptop; near-verbatim bullet points under heading "Genentech (Life Science)" and similar "ISPE-" bullets under "TRAINING" heading; upon information and belief, Long has no ISPE training).

45.    Beyond making false representations to innocent and unsuspecting prospective Clients, Long sent emails attaching CAI Proprietary Materials to HughGM and/or contacts in the

commissioning and construction industries, often indicating that he had illicitly obtained the material.  In these many instances, Long conveyed the material while stating that it was "CONFIDENTIAL INFORMATION" (capitals often included), and warning the recipients not to disseminate the materials publicly or to leak to the marketplace that Long had provided them. Long often teased these transmissions as samples, with the obvious insinuation that more such material would be forthcoming if the recipient would reciprocate by making good on an opportunity for HughGM.  *See*, *e.g.*, Exhibit 14.

46.   Upon information and belief, Long continued to use CAI Proprietary Materials to advance the interests of HughGM and to compete against CAI until at least the time of this action's original filing in December 2014.

**E.    HughGM's Other Principals Know of and Participate in the Scheme.**

47.   At least one other HughGM principal—Amburn—knew of, encouraged, and rewarded Long's illicit activities.  Specifically, Amburn knew that Long was misappropriating the Proprietary Materials from CAI and possibly other companies to advance the financial interests of HughGM (and thereby the financial interests of its principals).

48.   Upon information and belief, the other two HughGM principals—Doug Brown and Allen Jafari—either knew of, or willfully turned a blind eye to, these illicit activities.

**F.    Long Uses CAI Equipment and Falsely Records Time to Carry Out His Scheme.**

49.   CAI did not and does not have a physical corporate office in or near Seattle.  Per discussions between CAI and Long, Long was to work on-site that the Client facilities where CAI was hired to perform Commissioning Services, and from his home.  Long's duties would require him to travel around and outside of the Seattle area.  Accordingly, CAI provided Long with the use of company laptop so that he could perform these duties.

50.     To streamline the above misappropriation of business opportunities and Proprietary Materials, Long ran his HughGM business from his CAI company laptop.  He integrated his HughGM and CAI email accounts and calendars within the same Microsoft Outlook platform on his CAI laptop.  This setup allowed Long to quickly and easily pass Proprietary Materials from his CAI emails and project folders through his HughGM email account to HughGM partners and prospective Clients.

51.     Throughout his employment at CAI, Long submitted fraudulent expense reports and doctored travel invoices (often for travel that never actually transpired), which CAI reimbursed in full, until it learned of Long's scheme in August 2014.  In a signed writing, Long admitted to falsifying all expense reports since May 2014 and agreed to repay the related amounts in full, but has not done so.  *See* Exhibit 15.  Upon information and belief, Long submitted fraudulent expense reports throughout his employment at CAI, well before May 2014.

52.     At several points during the course of his employment at CAI, CAI's Clients and managers found Long's performance to be unsatisfactory.  These observations included opinions that: (A) Long was an inefficient worker; (B) he missed deadlines; (C) he took a very long time to complete even simple tasks; and (D) Clients found his due diligence and documentation for work performed to be lacking.  CAI shared these observations with Long at every instance, and gave specific instruction to Long about how he could improve his performance.  Long's deficiencies are directly attributable to his failure to spend CAI work time on CAI projects, his efforts to maintain or seek employment with other commissioning firms, and his practice of spending his CAI work time overwhelmingly on advancing the interests of HughGM.

53.     Because he was compensated on an hourly basis, Long was given the responsibility of carefully tracking and recording the hours he worked every day (his "Time") and entering this information into a computer program.

54.     Upon information and belief, Long regularly recorded false Time entries throughout his employment at CAI.  Based on the above performance deficiencies and other recently discovered facts, it is possible that the great majority of this recorded Time was false.  Long recorded eight to 10 (or more) hours per day, often including weekends, even while spending full days working on behalf of HughGM or Long's other employers, and while on personal vacations far away from his CAI projects.  CAI paid Long his hourly rate for these falsely billed hours until it learned of Long's scheme upon his termination.

55.     In at least one instance, on a project for a Fortune 100 Client in Dublin, Ireland, Long's efforts to advance the interests of HughGM caused his CAI work to be so grossly deficient that it resulted in significantly more harm than benefit to CAI and its Client.  His work not only provided no value, but it has since required CAI to invest ample funds and other resources to undo the damage he caused.  Significantly, during and after his work on that project, Long surreptitiously led HughGM's aggressive pursuit of several projects for the same Client.  Upon information and belief, Long purposefully sought to damage CAI's relationship with this Client in an attempt to cause that Client not to hire CAI on future projects, thereby increasing the likelihood that the Client would award those projects to HughGM.

56.     CAI terminated Long on or about August 27, 2014, immediately after it learned of his practice of falsifying travel expenses, and memorialized this termination in a letter to Long ("Termination Letter").  *See* Exhibit 16.

57.     At multiple points after his termination, Long made false statements to CAI personnel in an attempt to induce them to convey to Long additional Proprietary Materials and to hide evidence of his wrongdoing.  For example, Long asked for passwords and folders from his CAI computer, for the stated purpose of having access to personal resources such as bank accounts and credit cards, but which upon information and belief actually contained or provided access to CAI Proprietary Materials, and would allow Long to destroy evidence of the above pattern of misconduct.

## COUNT I

### Breach of Contract – Long

58.     Paragraphs 1-57 are incorporated herein by reference.

59.     The Employment Agreement is a valid and binding contract.

60.     All conditions precedent relative to the contract claims have been performed or have occurred.

61.     Long has breached this contract with CAI.

62.     Long has breached this contract by, among other things, (A) using the Proprietary Materials for non-CAI purposes and to advance the interests of himself and of HughGM; (B) distributing the Proprietary Materials to non-CAI personnel; (C) using the Proprietary Materials outside of CAI's premises; (D) using the Proprietary Materials after his termination; and (E) engaging in other conduct in violation of the Employment Agreement, including but not limited to the unlawful conduct as described in the paragraphs above.

63.     CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.

64.     CAI requests this Court to enter judgment in its favor and against Defendant Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of

Long's breach of contract, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT II

### Breach of Fiduciary Duties – Long

65.     Paragraphs 1-64 above are incorporated herein by reference.

66.     As an employee of CAI, Long owed contractual and common law fiduciary duties to CAI, including the duties of loyalty, honesty, and good faith.

67.     Long has breached these fiduciary duties by, among other things, knowingly and intentionally taking unlawful actions inconsistent with the best interests of CAI, including but not limited to the following knowing and intentional acts: (A) converting and stealing monies from CAI; (B) over-recording and falsifying Time entries and expense reports; (C) converting and stealing the Proprietary Materials from CAI; (D) disseminating the Proprietary Materials to the commissioning marketplace, thereby eroding the value of these materials and injuring CAI's competitive advantages and market standing; (E) causing HughGM and other enterprises to compete directly and indirectly with CAI, and often using CAI Proprietary Materials to do so; (F) usurping CAI's corporate opportunities by failing to disclose proper corporate opportunities to CAI (on which CAI had the desire and ability to capitalize and earn substantial revenue) and/or failing to obtain CAI's consent to pursue such corporate opportunities as an individual or on behalf of HughGM; (G) failing to provide CAI with his best efforts (and failing to meet an absolute minimum standard of effort) as a wage-earning employee of CAI, and thereby depriving CAI of the value of the wages it paid and injuring CAI's standing with its Clients and in the commissioning marketplace; (H) purposefully failing in his CAI work in an attempt to convince

Clients to hire HughGM instead of CAI for future projects; (I) lying to CAI about his other personal and business interests (such as his ownership, employment, and/or similar involvement with HughGM and many other companies) and/or failing to disclose same; (J) falsifying CAI letters of recommendation and his personal resume in an attempt to win business for HughGM and other non-CAI businesses; (K) submitting falsified expense reports and travel receipts; and (L) submitting false Time entries.

68.     CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.

69.     CAI requests this Court to enter judgment in its favor and against Defendant Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of Long's breach of fiduciary duties, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT III

### Actual Fraud – Long

70.     Paragraphs 1-69 are incorporated herein by reference.

71.     Long made repeated and constant material misrepresentations to CAI about past and present facts.  He did so by taking actions including but not limited to the following: (A) failing to disclose and/or lying to CAI about his affiliations with other companies; (B) making fraudulent, material misrepresentations in his employment application on which CAI relied in hiring him; (C) lying to and/or misleading CAI about how he was spending his work time and why he had been unable to meet deadlines and performance goals; (D) failing to disclose and/or lying to CAI about what he was doing with the Proprietary Materials with which CAI had

entrusted him; (E) lying to and/or misleading CAI by indicating that he was working or had worked toward pursuing business for CAI, while instead pursuing or having pursued the same business exclusively on behalf of HughGM; (F) submitting falsified expense reports and travel receipts; and (G) submitting false Time entries.

72.     Long made all of the above misrepresentations with full knowledge that they conveyed false and/or misleading information.  Long intended to defraud and/or mislead CAI, for the purpose of advancing the interests of HughGM, receiving compensation for hours never worked, and receiving reimbursements for expenses never incurred.

73.     CAI relied on these misrepresentations to its detriment.  CAI relied on Long's misrepresentations when it decided to hire him, to give him access to the Confidential Information, to allow him to continue working for CAI, to pay him wages for the Time he reported, and to reimburse the expenses that he purported to incur.  CAI's detriment included but was not limited to losing the value of the Proprietary Information (and losing the Proprietary Information itself), losing business opportunities that Long pursued in competition with CAI, losing the value of the work that Long said he was providing, and losing funds based on Long's fraudulently reported Time and expenses.

74.     CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.

75.     Because Long's misconduct amounts to criminal fraud, CAI is statutorily entitled to treble damages, attorney's fees, and costs under Indiana Code ("I.C.") § 34-24-3-1. Additionally, as Long's misconduct was intentional and actual fraud, Plaintiffs are entitled to punitive damages.

76.     CAI requests this Court to enter judgment in favor of CAI and against Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of Long's fraud, and to award CAI its damages established at trial, pre- and post-judgment interest, treble damages, punitive damages, attorney's fees and costs, and all further relief this Court deems just and proper.

## COUNT IV

### Constructive Fraud – Long

77.     Paragraphs 1-76 are incorporated herein by reference.

78.     In the alternative, CAI states a claim for constructive fraud.

79.     As stated above, Long owed to CAI fiduciary duties as an employee of CAI. Additionally or alternatively, Long had a special relationship with CAI, in that he had a fiduciary and/or confidential relationship with CAI by virtue of being a trusted employee of CAI, knowingly and explicitly undertaking the duty to maintain the confidentiality of CAI's Proprietary Materials, and explicitly acknowledging the importance of that duty.

80.     As stated above, Long made repeated and constant material misrepresentations to CAI about past and present facts, and further remained silent when his fiduciary duties compelled him to disclose relevant information to CAI.

81.     As stated above, CAI relied on these misrepresentations to its detriment, and suffered injury as a direct and proximate result of these misrepresentations.

82.     Long thereby gained the advantage of furthering his and HughGM's business interests and by receiving fraudulently obtained cash payments, at the expense of CAI.

83.     CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.

84.    Because Long's misconduct amounts to criminal fraud, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.  Additionally, Plaintiffs are entitled to punitive damages.

85.    CAI requests this Court to enter judgment in favor of CAI and against Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of Long's fraud, and to award CAI its damages established at trial, pre- and post-judgment interest, treble damages, punitive damages, attorney's fees and costs, and all further relief this Court deems just and proper.

## COUNT V

### Tortious Interference with a Business Relationship – HughGM and Long

86.    Paragraphs 1-85 are incorporated herein by reference.

87.    HughGM and Long are and were aware of the existence of CAI's current active and past business relationships, and current active and past contracts.

88.    By pursuing business covered by those contracts and relationships, pursuing subsequent work with the Client counterparties to those contracts, intentionally performing grossly deficient work for CAI pursuant to those contracts, and making material and fraudulent misrepresentations and omissions to CAI about their actions, HughGM and Long have intentionally interfered with CAI's business relationships with its Clients related to these contracts.  Long's illegal acts described in the Counts above and below were an integral and necessary part of this conduct.

89.    HughGM and Long have no justification for this interference, especially because they learned about these relationships by virtue of Long's employment with CAI, and interfered with these existing relationships using CAI Proprietary Materials.  HughGM and Long knew that

they had no implicit or explicit authority from CAI to interfere with these relationships, and knew that their actions would cause harm to CAI.

90.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

91.    CAI requests this Court to enter judgment in favor of CAI and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's tortious conduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT VI

### Tortious Conversion – HughGM and Long

92.    Paragraphs 1-91 above are incorporated herein by reference.

93.    The Proprietary Materials are and always were property that belonged exclusively to CAI.  They were generated and/or maintained by CAI exclusively for CAI business.  Further, CAI's standard employment agreement states that items such as the Proprietary Materials belong exclusively to CAI, and not to individual employees.

94.     HughGM and Long exerted unauthorized control over the Proprietary Materials by exercising dominion over them in defiance of CAI's rights as their lawful possessor, and/or by using them well beyond the scope of Long's employment with CAI to advance the interests of HughGM and Long, often to CAI's detriment.

95.     CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

96.     CAI requests this Court to enter judgment in favor of CAI and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's tortious conduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT VII

### Criminal Conversion – HughGM and Long

97.     Paragraphs 1-96 above are incorporated herein by reference.

98.     The Proprietary Materials are and always were property that belonged exclusively to CAI.

99.    HughGM and Long knew that the Proprietary Materials belonged exclusively to CAI because they were generated and/or maintained by CAI exclusively for CAI business. HughGM and Long further knew that the Proprietary Materials belonged exclusively to CAI because CAI explicitly informed Long that this was so, via the "Confidential Information" clause of the Employment Agreement and other communications.   Long signed the Employment Agreement, thereby verifying that he understood the Proprietary Materials to be the exclusive property of CAI, and thereby acknowledging that any exertion of control over CAI property on his own behalf or on behalf of another entity (such as HughGM or MCC) was strictly unauthorized.

100.    HughGM and Long therefore knowingly and intentionally exerted unauthorized control over CAI's Proprietary Materials by using them well beyond the scope of Long's employment with CAI, to advance the interests of HughGM and Long, often to CAI's detriment. As discussed above, HughGM's and Long's conduct in this regard included using the Proprietary Materials with the knowledge and intent of stealing business opportunities from CAI, to compete with CAI, or to otherwise pursue HughGM's economic interests.

101.    Other principals of HughGM engaged in this conversion by soliciting, encouraging, rewarding, and otherwise participating in the exertion of unauthorized control over CAI property.   They demonstrated through their words and actions that they knew and intended to exert such control, and that they knew that such control was unauthorized.

102.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.   This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and

Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

103.    Because HughGM's and Long's misconduct with respect to the Proprietary Materials amounts to criminal conversion of CAI's property, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.

104.    Long further knowingly and intentionally exerted unauthorized control over CAI property by submitting false Time entries and expense reports.  Long deliberately falsified these materials, and therefore knew and intended them to be false.  Long knew that this practice was dishonest and not authorized by CAI.  Long therefore knew and intended that as a result of his actions, he would exert unauthorized control over CAI funds, to which he had no property right.

105.    CAI has suffered substantial pecuniary loss as a direct and proximate result of this unauthorized control and unauthorized use of its funds.

106.    Because Long's misconduct with respect to CAI funds amounts to criminal conversion of CAI's property, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.

107.    CAI requests this Court to enter judgment in favor of CAI and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's illegal conduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, treble damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT VIII

### Theft – HughGM and Long

108.    Paragraphs 1-107 above are incorporated herein by reference.

109.    By its knowing and intentional exertion of unauthorized control over the Proprietary Materials—for example, stripping the Proprietary Materials of their proprietary and confidential character by sharing them with the commissioning marketplace and with CAI competitors, and using the Proprietary Materials to pursue and win business for HughGM and not for CAI—HughGM and Long intended to deprive and did deprive CAI of part or all of the Proprietary Materials' value and/or use.

110.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

111.    Because HughGM's and Long's misconduct with respect to CAI Proprietary Materials amounts to criminal theft of CAI's property, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.

112.    By his knowing and intentional exertion of unauthorized control over the CAI funds—i.e., by causing CAI to pay and by accepting funds based on documents and data that

Long knowingly and intentionally falsified—HughGM and Long intended to deprive and did deprive CAI of part or all of the value and/or use of those funds.

113.    CAI has suffered substantial pecuniary loss as a direct and proximate result of this misconduct.

114.    Because Long's misconduct with respect to CAI funds amounts to criminal theft of CAI's property, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.

115.    CAI requests this Court to enter judgment in favor of CAI and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's illegal conduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, treble damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT IX

### Receiving Stolen Property – HughGM

116.    Paragraphs 1-115 above are incorporated herein by reference.

117.    In addition to committing the above actions of conversion and theft, and/or in the alternative, HughGM, through the actions of its principals, knowingly and intentionally received, retained, and/or disposed of CAI's Proprietary Materials while knowing that the Proprietary Materials were subject to a theft.

118.    HughGM and its principals demonstrated their knowledge that the Proprietary Materials were subject to a theft by soliciting, encouraging, rewarding, and participating in the exertion of unauthorized control over CAI property, and demonstrated through their words and

27

actions that they knew these materials were stolen and that they knew that they were receiving them and intended to receive them as such.

119.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

120.    Because HughGM's misconduct with respect to CAI Proprietary Materials amounts to criminal receiving stolen property, CAI is statutorily entitled to treble damages, attorney's fees, and costs under I.C. § 34-24-3-1.

121.    CAI requests this Court to enter judgment in favor of CAI and against HughGM for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's illegal conduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, treble damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT X

### Misappropriation of Trade Secrets – HughGM and Long

122.    Paragraphs 1-121 above are incorporated herein by reference.

123.    Long and HughGM are both "persons" within the meaning of the Indiana Uniform Trade Secrets Act, I.C. § 24-2-3-2.

124.    Much of the Proprietary Materials constitute "trade secrets" within the meaning of the Indiana Uniform Trade Secrets Act, I.C. § 24-2-3-2.  Materials including but not limited to Client lists, market research, proposals, bidding and quote systems, and logistics plans are "trade secrets" in that they derive actual or potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.  CAI used efforts reasonable under the circumstances to maintain their secrecy.

125.    Long gained access to these trade secrets solely by virtue of his employment with CAI.  CAI entrusted Long with these trade secrets, and made clear in the Employment Agreement that these were trade secrets and that Long must protect their secrecy.  CAI never gave Long express or implied consent to use the trade secrets for any non-CAI purposes.

126.    Long used improper means such as theft and misrepresentation (as described above and below) to acquire and misappropriate these trade secrets.  Long disclosed the trade secrets to HughGM and other market participants—while fully disclosing to them in clear terms that these were misappropriated trade secrets—and used the trade secrets in his efforts to win business for HughGM.  Prior to and at the time of this disclosure, HughGM knew that Long was an employee fiduciary of CAI, and that Long had a duty to maintain the secrecy of the trade secrets.  Therefore, at the time of this disclosure and use, HughGM knew or had reason to know that its knowledge of the trade secret was: (A) derived from or through Long and that Long had utilized improper means to acquire it; (B) acquired under circumstances giving rise to Long's duty to maintain its secrecy or limit its use; and/or (C) derived from or through Long, who owed a duty to CAI to maintain its secrecy or limit its use.

127.    Long's and HughGM's conduct in misappropriating and receiving the trade secrets was not only knowing and intentional, but also willful and malicious.

128.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.   This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

129.    Under I.C. § 24-2-3-3, CAI is entitled to an order from the Court enjoining Long's and HughGM's use of the trade secrets.

130.    Under I.C. § 24-2-3-4, CAI is further entitled to recover monetary damages for its loss, for Long and HughGM's unjust enrichment, and/or for royalty.   Additionally, CAI is entitled to double damages ("exemplary damages").

131.    CAI requests this Court to enter judgment in favor of CAI and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's illegal conduct, and to award CAI damages established at trial, pre- and post-judgment interest, costs, attorney's fees, double damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT XI

**Violation of Indiana's Corrupt Business Influence Act – HughGM and Long**

132. Paragraphs 1-131 above are incorporated herein by reference.

133. HughGM is an "enterprise" within the meaning of I.C. § 35-45-6-1, that Long operated through a pattern of racketeering activity.

134. Long engaged in a pattern of racketeering activity, as defined by I.C. § 35-45-6-1, by committing (through the conduct described above and below) at least two acts of fraud, theft, and/or conversion in violation of I.C. § 35-43-4-2, -4-3, & -5-4.

135. Long and HughGM directly and/or indirectly received income from the above pattern of racketeering activity by, among other things, using illicitly obtained CAI Proprietary Materials to: (A) win business, projects, clients, referrals, and the like for HughGM; (B) raise HughGM's and Long's profile in the commissioning industry, or otherwise attract the attention of or demonstrate purported competence to potential customers; and/or (C) fulfill existing and/or later-acquired contracts and business. (One example of this is, as described above, HughGM's use of CAI Proprietary Materials to bid on and win a large and lucrative project from a Fortune 100 Client that would have been ideal business for CAI.) Long and HughGM used part or all of that same income and/or its proceeds in the operation of HughGM. This is a violation of I.C. § 35-45-6-2(1).

136. Long further used that same income and/or its proceeds to acquire an interest in HughGM. Long made one or more capital contributions in HughGM, enabled in part by income derived directly or indirectly from the conduct described in the preceding paragraph, and/or by stealing or otherwise fraudulently obtaining funds from CAI through actions such as falsifying time entries and expenses. Long and HughGM may have also defrauded certain HughGM

members and/or investors of their capital contributions and/or interests in HughGM, or otherwise fraudulently misled other HughGM members about their respective interests in HughGM. These are also violations of I.C. § 35-45-6-2(1).

137. Long participated in and conducted HughGM's affairs, directly and indirectly, through the above pattern of racketeering activity. This is a violation of I.C. § 35-45-6-2(3).

138. The above pattern of racketeering activity (A) was related to and/or committed within the course of Long's employment at and management of HughGM, (B) was committed in furtherance of HughGM and its interests, and (C) was authorized or subsequently acquiesced in by HughGM. HughGM was not a mere unwitting conduit of the above pattern racketeering activity; HughGM's upper echelons were directly involved in it, were aware of it, and/or acquiesced in it. This is evident from the conduct Long, a HughGM principal, and Amburn, a HughGM principal and co-founder, described above.

139. As described in detail in the Counts above, Long committed fraud, conversion, and theft, pursuant to and as part of his participation in and his conducting of HughGM's affairs. He did/does so by knowingly and intentionally making false and material representations of past or existing facts to CAI (on which CAI relied to its detriment), by exerting unauthorized control over the property of CAI with the intent to deprive CAI of its value and/or use, and by knowingly and intentionally receiving and using CAI's property while knowing that the Proprietary Materials were subject to a theft. Accordingly, the above acts were necessary to execute Long's scheme on behalf of HughGM.

140. As described in detail in the Counts above, Long committed multiple overt acts in furtherance of this fraud, theft, and/or conversion, including but not limited to the following: (A) lying to or misleading CAI about his affiliations with HughGM and other companies; (B)

32

stealing Proprietary Materials on behalf of HughGM, transferring them to HughGM, and using them for HughGM business; (C) lying to or misleading CAI about his work and his need for Proprietary Materials to perform that work, thereby inducing CAI to transmit to him Proprietary Materials that he would transmit to HughGM for use for HughGM business; (D) submitting false time entries and lying to CAI about his work and progress on CAI projects, thereby allowing him to maintain employment with CAI despite spending most of his CAI work time working on behalf of HughGM; and (E) transmitting CAI Proprietary Materials to Clients while falsely and fraudulently representing that the materials belonged to and were created by HughGM.

141.    These acts share a relationship sufficient to establish racketeering activity because they were carried out by the same participants (Long), for the same purposes (to defraud CAI and its Clients for the benefit of Long and HughGM), and had the same results to the same victim (CAI lost funds rightfully belonging to it, lost business and business opportunities, and lost the value of its Proprietary Materials).

142.    These acts share continuity sufficient to establish racketeering activity because they constitute a lengthy period of repeated conduct.  HughGM has existed since 2006.  Long (with HughGM agents such as Amburn and Robert Evans) began his pattern of racketeering activity that victimized CAI no later than (and likely earlier than) October 2012.  *See* Exhibit 17 ("[T]alked with some guys at Commissioning Agents, Inc . . . . Did not disclose us, what we do, etc."; "CAI is a large commissioning[-]only firm . . . . I have listed you as a reference . . . . I have not mentioned that we are partners in MCC.").  Upon information and belief, Long's pattern of racketeering behavior with and on behalf of HughGM began well before then.  CAI presently has access only to limited evidence from a window of October 2012 to August 2014, but reasonably believes that discovery will reveal evidence sufficient to show that this pattern of racketeering

began even earlier than October 2012, lasted beyond August 2014, and likely is still ongoing and will continue into the future.

143.    Additionally or alternatively, these acts share continuity sufficient to establish racketeering activity because they constitute a distinct threat of continued racketeering activity projected into the future.  Long and HughGM still have CAI's Proprietary Materials, and have shown through their actions that they are likely to continue to improperly use the Proprietary Materials in the future to advance HughGM's business, and to defraud CAI's Clients in doing so. Although HughGM appears to conduct a legitimate business of providing Commissioning Services, the above illicit acts constitute its regular way of operating that business.  Upon information and belief, HughGM's principals operated the company by stealing from and defrauding its principals' employers (as Long did to CAI), and using the Proprietary Materials improperly gained from those employers to win business for HughGM.

144.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

145.    CAI is entitled to recovery of treble damages, costs, and attorney's fees pursuant to I.C. § 34-24-3-1.

146. CAI is also entitled to injunctive relief pursuant to I.C. § 34-24-2-6 in the form of an order freezing Long's and/or HughGM's accounts insofar as they hold substantial funds belonging to CAI, and enjoining Long and HughGM from using CAI Proprietary Materials and requiring that Long and HughGM return those materials to CAI.

147. CAI requests this Court to enter judgment in favor of CAI and against Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of Long's systematic, continuous, and willful illegal conduct, to issue an order freezing Long's bank accounts insofar as they hold CAI's property in substantial cash amounts, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, treble damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

## COUNT XII

**Violation of the Federal Racketeer Influenced and Corrupt Organizations Act – HughGM and Long**

148. Paragraphs 1-147 above are incorporated herein by reference.

149. HughGM is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), that Long operated through a pattern of racketeering activity.

150. HughGM is engaged in and its activities affect interstate commerce.

151. Long is a "person" within the meaning of 18 U.S.C. § 1961(3) who owns, is employed by, or is associated with HughGM, the enterprise.

152. Long engaged in and conspired to engage in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), by committing (through the conduct described above and below) at least two acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

153.   Long and HughGM directly and/or indirectly received income from the above pattern of racketeering activity by, among other things, using illicitly obtained CAI Proprietary Materials to: (A) win business, projects, clients, referrals, and the like for HughGM; (B) raise HughGM's and Long's profile in the commissioning industry, or otherwise attract the attention of or demonstrate purported competence to potential customers; and/or (C) fulfill existing and/or later-acquired contracts and business.  (One example of this is, as described above, HughGM's use of CAI Proprietary Materials to bid on and win a large and lucrative project from a Fortune 100 Client that would have been ideal business for CAI.)  Long and HughGM used part or all of that same income and/or its proceeds in the operation of HughGM.  This is a violation of Section 1962(a).

154.   Long further used that same income and/or its proceeds to acquire an interest in HughGM.  Long made one or more capital contributions in HughGM, enabled in part by income derived directly or indirectly from the conduct described in the preceding paragraph, and/or by stealing or otherwise fraudulently obtaining funds from CAI through actions such as falsifying time entries and expenses.  Long and HughGM may have also defrauded certain HughGM members and/or investors of their capital contributions and/or interests in HughGM, or otherwise fraudulently misled other HughGM members about their respective interests in HughGM.  These are also violations of Section 1962(a).

155.   Long participated in and conducted HughGM's affairs, directly and indirectly, through the above pattern of racketeering activity.  This is a violation of Section 1962(c).

156.   Long and HughGM knowingly, intentionally, and willfully conspired with one another and with others to violate the provisions of Sections 1962(a) and (c), as described above. This is a violation of Section 1962(d).

157.   The above pattern of racketeering activity (A) was related to and/or committed within the course of Long's employment at and management of HughGM, (B) was committed in furtherance of HughGM and its interests, and (C) was authorized or subsequently acquiesced in by HughGM.   HughGM was not a mere unwitting conduit of the above pattern racketeering activity; HughGM's upper echelons were directly involved in it, were aware of it, and/or acquiesced in it.   This is evident from the conduct Long, a HughGM principal, and Amburn, a HughGM principal and co-founder, described above.

158.   Long carried out a scheme to defraud CAI and its Clients by knowingly and intentionally using the wires (email transmissions) and/or the United States Mail to commit a series of multiple and repeated overt acts, including but not limited to the following: (A) lying to or misleading CAI about his affiliations with HughGM and other companies; (B) lying to or misleading CAI about his work and his need for Proprietary Materials to perform that work, and thereby inducing CAI to transmit to him Proprietary Materials that he would transmit to HughGM for use in HughGM business; (C) submitting false time entries and lying to CAI about his work and progress on CAI projects, thereby allowing him to maintain employment with CAI despite spending most of his CAI work time working on behalf of HughGM; and (D) transmitting CAI Proprietary Materials to Clients while falsely and fraudulently claiming that the materials belonged to and were created by HughGM.

159.   The above acts were necessary to execute Long's scheme on behalf of HughGM. CAI would not have hired, retained, or shared Proprietary Materials with Long if Long did not lie about his involvement with HughGM, about the real reasons behind his requests for Proprietary Materials, and about what he was doing with his work time.  HughGM's current and prospective clients would not have considered a business relationship with HughGM if Long did

not lie about who owned and created the materials that he transmitted to them in his attempt to win their business.

160.   For the reasons described in the preceding Count, these acts share a relationship and continuity sufficient to establish racketeering activity.

161.   CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.   This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

162.   CAI is entitled to recovery of treble damages, costs, and attorney's fees pursuant to 18 U.S.C. 1964(c).

163.   CAI is also entitled to injunctive relief pursuant to Federal Rule of Civil Procedure 64, 18 U.S.C. 1964(c), and I.C. § 34-24-2-6, in the form of an order freezing Long's and/or HughGM's accounts insofar as they hold substantial funds belonging to CAI.   CAI is further entitled to injunctive relief pursuant to 18 U.S.C. 1964(a) via an order from the Court enjoining Long and HughGM from using CAI Proprietary Materials and requiring that Long and HughGM return those materials to CAI.

164.   CAI requests this Court to enter judgment in its favor and against Long for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of Long's systematic, continuous, and willful illegal conduct, to issue an order freezing Long's

bank accounts insofar as they hold CAI's property in substantial cash amounts, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, treble damages, punitive damages, an injunction, and all further relief this Court deems just and proper.

**COUNT XIII**

**Unjust Enrichment – HughGM and Long**

165.    Paragraphs 1-164 above are incorporated herein by reference.

166.    In the alternative, CAI states a claim for unjust enrichment.

167.    By providing Long (A) access to the Proprietary Materials, (B) an hourly wage, and (C) reimbursement of work-related expenses, CAI conveyed to Long a benefit (the "Benefit").

168.    Long accepted the Benefit by explicitly or impliedly consenting to receive it.

169.    CAI received effectively no value in return for conveying the Benefit to Long. CAI expected to receive Long's professional services in exchange for the Benefit, and conveyed the Benefit to allow Long to provide those professional services.  Upon information and belief, Long performed far less work than he claimed and for which he was paid during his employment at CAI.  Long also produced very little work product that could be used in CAI projects, which often left CAI unable to charge its Clients for Long's work.  Long therefore provided very little in the way of professional services or any other return benefit to CAI.

170.    Due to Long's and HughGM's actions to conceal their activities, CAI also conveyed this benefit to HughGM without knowing it was doing so.

171.    HughGM and Long have enriched themselves by virtue of receiving and using the Benefit.

39

172.    HughGM and Long continue to exert control over the value of the Benefit and refuse to return it to CAI.

173.    HughGM and Long also use and have used a falsified CAI letter of recommendation to advance their business interests.

174.    HughGM and Long have been unjustly enriched, to the detriment of CAI.

175.    CAI has suffered substantial pecuniary loss as a direct and proximate result of HughGM's and Long's misconduct.  This loss includes, but is not limited to, tangible and intangible property loss or damage in the form of: (A) partial or complete lost use of and value in certain Proprietary Materials, and other CAI tangible and intangible property, that HughGM and Long publicly disseminated and/or otherwise corrupted; (B) injured or lost goodwill with existing or prospective Clients and industry partners; (C) damage to community and industry reputation; and (D) money spent to investigate and attempt to mitigate the damage of HughGM's and Long's misconduct.

176.    CAI is entitled to an award of damages.

177.    CAI requests this Court to enter judgment in its favor and against HughGM and Long, jointly and severally, for substantial damages suffered as a direct, proximate, foreseeable, and consequential result of HughGM's and Long's misconduct, and to award CAI its damages established at trial, pre- and post-judgment interest, costs, attorney's fees, punitive and exemplary damages, an injunction, and all further relief this Court deems just and proper.

## <u>COUNT XIV</u>

### Request for Injunctive and Other Relief – HughGM and Long

178.    Paragraphs 1-177 above are incorporated by reference.

179.    Long's conduct violates his legal and contractual duties to CAI.  HughGM's conduct violates its legal duties to CAI.

180.    CAI has suffered and will continue to suffer immediate and irreparable harm if HughGM and Long are not preliminarily and permanently enjoined from using the Proprietary Materials.  Specifically, unless the Proprietary Materials are immediately restrained, HughGM and Long may further use and devalue CAI's Proprietary Materials and CAI's Client relationships, and may transfer funds that HughGM earned by using the Proprietary Materials from their accounts into further separate accounts that are not controlled or accessible by CAI.

181.    CAI has suffered and will continue to suffer immediate and irreparable harm (based on the funds that Long stole from CAI) if HughGM and Long are not preliminarily and permanently enjoined from using Long's personal funds and accounts or such funds as Long may have subsequently transferred to HughGM.  Specifically, unless these funds and accounts are immediately restrained, HughGM and Long may transfer these funds from their accounts into further separate accounts that are not controlled or accessible by CAI.

182.    CAI has suffered and will continue to suffer immediate and irreparable harm if HughGM and Long are not preliminarily and permanently enjoined from using falsified CAI materials (such as fraudulent CAI letters of recommendation) or other representations about affiliations with CAI to advance their interests.  Such conduct diminishes CAI's standing the marketplace for Commissioning Services, and allows Long and HughGM to unjustly benefit from false purported associations or affiliations with CAI.

183.    CAI will suffer immediate harm if relief is denied.  By contrast, no cognizable legal harm will accrue to HughGM or Long from the requested preliminary and permanent injunction because they do not have any legal right to the Proprietary Materials or the funds improperly paid.

184.    Injunctive relief is appropriate because protection and maintenance of CAI's legitimate interests is a vital and legitimate business concern.  Further, HughGM's and Long's actual or inevitable use or disbursement of CAI's property for their economic purposes or benefits will cause irreparable harm to CAI.  Injunctive relief also is warranted pursuant to I.C. § 34-24-2-6, Federal Rule of Civil Procedure 64, and 18 U.S.C. 1964(c).

185.    The public interest will not be harmed—and instead will be benefited—if an injunction is granted.

186.    In this case, security is not necessary because HughGM and Long have obtained CAI's property by criminal means, but to the extent the Court requires security, CAI is willing to post sufficient security to cover any costs or damages that might accrue to HughGM or Long if it later is determined that a preliminary injunction was wrongfully entered.  However, no harm can result to HughGM or Long because their actions were in violation of statutory, legal, and/or contractual obligations to CAI, and were all without legal basis.

187.    The Court should grant CAI's request for a preliminary injunction and enter an order precluding HughGM and Long from further controlling said Proprietary Materials and funds by ordering a freeze of their respective bank accounts insofar as they hold CAI's property, enjoining HughGM and Long from further disseminating or otherwise using the Proprietary Materials, and compelling HughGM and Long to return the funds and Proprietary Materials.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

Dated:          February 12, 2015                    Respectfully Submitted,

                                                     */s/ Christopher Bayh*
                                                     T. Joseph Wendt
                                                     Christopher J. Bayh
                                                     Barnes & Thornburg, LLP
                                                     11 South Meridian Street
                                                     Indianapolis, Indiana 46204
                                                     Tel: (317) 236-1313
                                                     Joe.Wendt@btlaw.com
                                                     Chris.Bayh@btlaw.com
                                                     *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 12th day of February, 2015, a true and complete copy of the foregoing was filed electronically using the Court's CM/ECF system, and served upon all counsel and/or parties of record via same.


*/s/ Christopher Bayh*
Christopher J. Bayh