**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| COMMISSIONING AGENTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT G. LONG, Individually; | ) |
| | ) |
| HUGH GENERAL MANAGEMENT, LLC, | ) |
| d/b/a HUGHCX d/b/a HUGHGM; | ) |
| | ) |
| HUGHCX, LLC, d/b/a HUGHGM d/b/a | ) |
| HUGH GENERAL MANAGEMENT; and | ) |
| | ) |
| MISSION CRITICAL COMMISSIONING, LLC | ) |
| d/b/a HUGHGM d/b/a HUGHCX | ) |
| d/b/a HUGH GENERAL MANAGEMENT, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 1:15-cv-00062-
TWP-DKL

**PLAINTIFF COMMISSIONING AGENTS, INC.'S BRIEF IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiff Commissioning Agents, Inc. ("CAI") filed its First Amended Complaint

("Complaint") on February 12, 2015.  Dkt. 25 ("Compl.").  All Defendants in this case have

since moved to dismiss for lack of personal jurisdiction.  Dkt. 28 (by Defendants Hugh General

Management, LLC ("HughGM") and HughCx LLC ("HughCx")); Dkt. 30 (by Defendants

Robert G. Long ("Long") and Mission Critical Commissioning ("MCC"), incorporated Dkt. 11-

2)[1].  For the following reasons, these motions should be denied.

---

[1] As explained in the Complaint, the facts of this case suggest that Defendants have endeavored
to confuse their identities in order to avoid the detection of the fraudulent schemes at issue in this
lawsuit.  *See* Compl. 3-5 ¶¶ 11-12, 16-19.  As in the Complaint, CAI considers HughCx and

Defendants' motions to dismiss for lack of personal jurisdiction do not even mention the nationwide jurisdiction provided under the federal RICO statute that is the crux of CAI's claims. That express, nationwide jurisdiction eliminates the need for any minimum contacts analysis and, alone, requires that Defendants' motions be denied.

Separately, the facts establish Long's and HughGM's minimum contacts with Indiana for purposes of the claims at issue in this case.  CAI is an Indiana company with it principal place of business in Indiana.  As a CAI employee, Defendant Long intentionally lied to CAI in Indiana about his employment activities, submitted false timesheets and false expense reports to CAI in Indiana and thus received unjustified payments from CAI, which originated in Indiana, and stole CAI's property from CAI's Indiana databases, all for the benefit of himself and HughGM, one of CAI's competitors, with whom Long was also secretly employed.  Thus, Long intentionally directed his fraudulent activity toward Indiana, intentionally stole CAI's confidential and proprietary materials and thus intentionally harmed CAI in Indiana.  Ample evidence shows that HughGM partners—including its founder, George Amburn—knew about, approved, and encouraged Long's illicit actions toward the Indiana company, and that those same principals knowingly received the benefits of Long's lies, fraud, and theft.

Long's repeated, intentional conduct toward CAI and his intent to harm it, for the benefit of HughGM, were not untargeted negligence or isolated or fortuitous contact with Indiana or the result of CAI's unilateral activity.  They represent systematic, repeated conduct intentionally directed at CAI in Indiana, intended to cause harm to CAI in Indiana and are thus sufficient to subject him to jurisdiction here under established Supreme Court minimum contacts precedent.

---

MCC to be a part of HughGM, and all assertions here of conduct by one of the three apply equally to the other two.

Defendants' arguments otherwise fail as a matter of law and fact.  For this independent reason, their motions to dismiss should be denied.

## STATEMENT OF RELEVANT FACTS

In 2012, when Long began his employment with CAI, neither Long nor HughGM were established in the field of building commissioning.  They had few clients, had built little reputation, and lacked the industry contacts and written processes necessary to attract and win business.  To succeed in their chosen field, they had two options: slowly build expertise, a client base, and a strong reputation through hard work, or steal these things from an established competitor.  They chose the latter course, and their victim of choice was an Indiana company CAI.

**I.      CAI is an Indiana company with its principal business functions directed from Indiana.**

CAI is an Indiana corporation with its principal place of business in Indianapolis, Indiana.  Its information technology center is in Indianapolis.  Its training center is in Indianapolis.  Its senior management is in Indianapolis.  CAI runs its accounting, human resources, marketing, administrative, data-management, and technology functions out of Indianapolis.  Other than a tiny, shared workspace outside of Boston, all CAI offices in the continental United States are in Indianapolis.  *See* Exh. 1, Chew Decl. ¶¶ 4-11.

**II.     Long and HughGM intentionally directed their fraudulent activity at CAI in Indiana and intended to harm CAI in Indiana.**

CAI was a well-established commissioning company at the time Long sought employment with CAI.  Long initiated contact with CAI, and then met with CAI's Indianapolis-based CEO, Robert Chew to discuss the possibility of an employment relationship.  *See* Exh. 1,

Chew Decl. ¶¶ 4, 18.  From the beginning, Long intended to gain access to and then use CAI's business information for his and HughGM's benefit.

### A.      Long sent fraudulent materials into Indiana to secure his CAI employment.

Long sent his employment application to CAI's corporate headquarters in Indianapolis. This application was rife with misrepresentations, including lies about his skills, experience, employment history, and criminal history.  These misrepresentations made Long appear qualified for the job when he was not and were thus necessary to his scheme of misappropriating CAI's business information for his benefit.  Exh. 1, Chew Decl. ¶ 19; Compl. 6-7 ¶¶ 27-28 & Compl. Exh. 7; *see also* Compl. 12 ¶ 44 & Compl. Exh. 12-13 (detailed explanation of Long's falsification of subsequent resumes); *compare* Exh. 2, Long Application 12 (explanation of drug charge: "I definitely learned my lesson.  I have never engaged in any drug activity and never will.") *with* Exh. 3 (sampling of subsequent purchases of similarly illicit substances and syringes); *compare* Exh. 2, Long Application 3-5 (one past job listed) *with* Exh. 4 at 1-3 (application to competitors: many more past jobs listed for same timeframe).   In his early discussions with CAI, Long concealed from CAI his relationship with HughGM officer, Robert Evans, and their prior work together.  Exh. 29 (Oct./Nov. 2012 emails from Long to Evans: "[T]alked with some guys at Commissioning Agents, Inc . . . . Did not disclose us, what we do, etc."; "CAI is a large commissioning[-]only firm . . . . I have listed you as a reference . . . . I have not mentioned that we are partners in MCC.")[2]; Compl. 33 ¶ 146 & Compl. Exh. 17; Exh. 5 (California business registration for HughGM listing Robert Evans as registered agent).

---

[2] The evidence here indicates that MCC has since been absorbed by or is otherwise part of HughGM.  Compl. 8-9 ¶¶ 33-34.  HughGM disputes this, stating that MCC "is not and never has been owned by or otherwise legally affiliated with HughGM or HughCx."  Dkt. 28 at 1 n.1. HughGM supports this assertion only with Amburn's undetailed and self-serving statements, which cannot be reconciled with the facts of this case.  *See*, *e.g.*, Exh. 6 (Aug. 20, 2013 Long

In December 2012, based on his representations of his qualifications and his silence regarding his prior and existing relationship with Evans, CAI extended Long a job offer, from Indianapolis. Long accepted, becoming an employee of an Indiana-based company. *See* Exh. 1, Chew Decl. ¶ 19; Exh. 7.

**B.     Long traveled to Indiana and signed the Employment Agreement there.**

Long traveled to Indianapolis to begin his CAI employment. While in Indianapolis, he signed an employment agreement with CAI ("Employment Agreement"), in which he explicitly acknowledged that CAI's proprietary information and materials belonged exclusively to CAI. He further promised to keep those materials (and those of CAI's clients) confidential and not to use them for his own benefit or the benefit of others. Long personally returned this signed agreement to CAI's human resources department in Indianapolis. *See* Exh. 8 (Long Indianapolis hotel reservation Jan. 1-4, 2013); Exh. 9 (Employment Agreement, Long signature dated Jan. 2, 2013; stored in Long's CAI personnel file); Compl. 7-8 ¶ 30; Exh. 1, Chew Decl. ¶ 13.

**C.     Long reported to CAI's Indianapolis headquarters.**

Throughout his employment at CAI, Robert Long worked remotely from home in Washington and reported to CAI's Indianapolis office—not to any office in or near Washington. (Indeed, CAI's Indianapolis office is its closest American office to Long's residence; its only office closer to Long is the Calgary office, with which he did not interact.) Although his

---

email, copying Amburn: "I have folded my company with another company – Hugh Cx"). Notably, Long's motion does not dispute MCC's affiliation with HughGM. *See generally* Dkt. 11-2. HughGM would like the Court to believe that the lack of a verification page on CAI's amended Complaint (which is required by no federal or local rules) is a signal that CAI is backing down from its assertion regarding MCC. *See* Dkt. 28 at 2 n.2. CAI continues to stand by all of the allegations in its original, state-court complaint, which are repeated in full and expanded upon in the Amended Complaint. HughGM knows this, but is trying to distract the Court in the hopes of escaping the facts and case law that establish this Court's personal jurisdiction over HughGM.

employment required him to report on a per-project basis to certain individuals in North Carolina, California, Massachusetts, and Ireland, the only CAI entity to which Long reported continuously throughout his CAI tenure was its Indianapolis office.   Long was hired by, was fired by, was paid by, was evaluated by, submitted all work expenses to, and submitted all time reports to Indianapolis.   Exh. 1, Chew Decl. ¶¶ 7-10, 17, 20-24; Exh. 10, CAI office listing.

> ### D.   Long intentionally defrauded CAI by submitting false timesheets and expense reports to CAI's Indianapolis headquarters.

Throughout his employment at CAI, Long intended to harm CAI in Indiana by submitting false reports of time worked and falsified expense reports.   Long did so by sending his time reports to CAI's Indianapolis office through an online program, and by doctoring receipts and expense reports and sending them to CAI's Indianapolis office.   Specifically, Long sent over 80 fraudulent time reports to CAI's Indianapolis headquarters, and sent at least 22 separate fraudulent expense reports (which include over 100 pages of falsified materials) to CAI's Indianapolis headquarters.   In doing so, Long induced CAI's business management staff in Indianapolis to pay him unearned wages and to reimburse him for unspent expense funds out of CAI's Indianapolis bank accounts.   When CAI's business administration staff (in Indianapolis) discovered Long's fraudulent expense reports, CAI terminated Long immediately, via letter from Robert Chew in Indianapolis.   (When presented with the accusation of this expense fraud, Long signed a written admission; when subsequently accused of timesheet fraud, Long did not deny it.)   Long's behavior necessarily was directed at CAI in Indiana and intended to harm it there. *See* Exh. 1, Chew Decl. ¶¶ 22-27; Exh. 11 (signed admission of expense fraud); Exh. 12 (Aug. 29, 2014 Pursifull email to Long re falsified time); Exh. 13 (Aug. 26, 2014 CAI correspondence re Long expense fraud); Exh. 14 (Long expense reports; handwritten notations made by Business

Administrative Group during reimbursement process, prior to discovery of receipt falsification, to align report contents CAI with reimbursement policy).

### E.     Long devoted his CAI work time and professional efforts toward HughGM.

Long invested essentially all of his CAI work time toward advancing the interests of HughGM.   Unsurprisingly, CAI noticed that Long's work was deficient and in some cases nonexistent.   CEO Robert Chew several times sought justification and explanation from Long about what work he had done and why Long's projects seemed to be suffering.   Long knew that his CAI job was in jeopardy, as Chew (via a letter from Indianapolis) had provided an unfavorable review and demanded improvement in Long's performance.   In the hopes of avoiding termination and maintaining access to CAI's cache of proprietary materials that he could use to advance HughGM's business, Long sought to hide his double-dealing with HughGM by sending numerous communications to his CAI supervisors (including Chew) seeking to lull them into the false impression that Long was devoting his efforts to CAI.   *See* Exh. 15 (Dec. 3, 2013 Chew Letter of Instruction ); Exh. 16 (Long emails to Chew and others providing false explanations of deficiencies).   And as discussed above, Long also hid his utter lack of attention to his CAI duties and his exclusive attention to HughGM matters by submitting false timesheets and expense reports, which purported to show long hours and travel on behalf of CAI and its clients.

### F.     Long and HughGM stole CAI's proprietary materials from Indiana.

Long accessed CAI's proprietary materials which were created and maintained in Indiana and funneled them to HughGM.   Long acquired these materials by pulling them off of CAI's databases, managed at CAI's Indianapolis headquarters.   Long's access to CAI files was through its data server (which houses effectively all of CAI's proprietary documents) and through CAI's

Client Resource Management ("CRM") database (which houses information on CAI's industry contacts and client leads).  Both of these systems are cloud-based and are managed by CAI's Business Administration Group, exclusively out of CAI's Indianapolis headquarters.  As explained in CAI's complaint, these proprietary materials are essentially CAI's whole business— they represent years of expertise and experience (especially that of Indiana-based CEO and founder Robert Chew), toward which CAI has devoted significant (Indiana-based) resources.  And Long stole and misappropriated not only CAI's proprietary materials, but the proprietary materials of CAI's clients, also stored in CAI's Indiana databases.  Again, Long's actions were necessarily directed at CAI's business in Indiana and intended to harm it there.  *See* Exh. 1, Chew Decl. ¶ 11-14; Compl. 6, 11-12, ¶¶ 25-26, 42; Exh. 9 ("I understand that this information is proprietary and critical to the success of [CAI] and must not be given out or used outside of [CAI]'s premises or with non-[CAI] employees.").

> **G.   Long and HughGM stole CAI's proprietary materials in part to gain access to the Indiana commissioning marketplace.**

Defendants assert that they have never done any business in Indiana.  See Dkt. 28 at 1, 3; Dkt. 11-2 at 2-3.  Yet after accessing and stealing CAI's proprietary information—which included proprietary contacts, leads, business relationships, and industry intelligence—HughGM suddenly began pursuing at least two commissioning projects in Indiana.

First, HughGM and Long sent promotional materials to and developed detailed estimates to pursue an Indianapolis project with Indiana University Health Methodist Hospital.  Long helped HughGM to pursue this project, even though it would have been ideal business for CAI.  *See* Exh. 1, Chew Decl. ¶ 27; Exh. 17 (emails between HughGM and a North Carolina and Indiana-based consultant, "RE: HughCx Quals - Indiana Project" attaching HughGM promotional materials and "IU Health Methodist" spreadsheet proposal).

Second, HughGM also learned of and pursued a business opportunity with WPM Construction in Merrillville, Indiana.  HughGM negotiated and signed a consulting contract with this Indiana company.  Although the building site appears to be in Washington, the documents show that Defendants' knowledge of the project came through this Indiana construction connection, and that HughGM was awarded the project by and received payment from this Indiana company.  *See* Exh. 18 (email from Annette Castro, WPM Construction, Merrillville, Indiana; contract with affiliated corporation "WPPI Bellevue MFS 1000 E. 80th Place, Suite 700 North, Merrillville, IN 46410" (attached in email above)).  Long helped HughGM to pursue this project with an Indiana company, even though it would have been ideal business for CAI.  *See* Exh. 1, Chew Decl. ¶ 27.

### III.    Long committed his intentional, fraudulent acts toward CAI on behalf of HughGM, with HughGM's knowledge, authority and approval.

Long committed the acts detailed in the Complaint and above not just for his own benefit, but also for the benefit of HughGM.   Upon accessing CAI's proprietary materials and information, Long immediately delivered them to his HughGM partner and HughGM founder George Amburn.  *See* Exh. 19 (2013 emails showing Long receiving confidential CAI-addressed documents from CAI's Microsoft client representative Ed Slater re upcoming projects and then forwarding them to a non-CAI email account and to Amburn); Exh. 20 (Feb. 11, 2013 Long email to Amburn attaching CAI proprietary "VERY DETAILED COSTING/PRODUCTION histories" for CAI client Microsoft and providing CAI-created list of upcoming Microsoft projects); Exh. 21 (Aug. 27, 2013 Long email to Amburn attaching CAI-created, CAI-logo documents and instructing Amburn to submit same as part of HughGM's bid for project from CAI prospective client Boeing).

Long explicitly stated that these materials were illicitly acquired, and warned Amburn and his other HughGM partners to keep quiet to avoid detection of their scheme. Long and Amburn shared stolen CAI materials back and forth, and worked together to change logos and other CAI-identifying content to give the appearance that HughGM had created them. *See* Exh. 22 (Jan. 6, 2014 Long email to Amburn attaching detailed and proprietary CAI documents).

Amburn not only knew that the materials he received were stolen from Indianapolis-based CAI, but he actively participated in their further misappropriation by using them to pursue HughGM business. For example, in one instance, Amburn submitted a proposal seeking business for HughGM from Boeing, a CAI prospective client. The proposal was not only a CAI proprietary document, but Amburn had forgotten to disguise its origin—every page prominently displayed CAI's logo, and the document's text referred to work that "CAI" would provide. Amburn then tried to mislead Boeing by suggesting that the document arose from a (fabricated) joint project between CAI and HughGM, and looked on as Long explicitly lied to Boeing in the same fashion, representing that the document belonged to and was created in part by HughGM. *See* Exh. 23 1-2 & 31-42 (Aug. 27, 2013 emails: Amburn submits CAI proposal to Boeing); Exh. 24 (Aug. 28-29 emails: Boeing asks Amburn about HughGM's connection to CAI; Amburn provides false explanation of origin of document and instructs Long to submit different version of proposal; Long instead submits same CAI-logo proposal); Exh. 25 (Aug. 29 emails: Boeing again asks about HughGM's connection to CAI; Long emails Boeing same proposal with HughGM logo and name substituted and Long provides false explanation of HughGM's supposed past affiliation with CAI); Exh. 26 (Long provides verbatim report of lie to Boeing to HughGM partners, including Amburn (email represented as "'G'")); Exh. 1, Chew Decl. ¶ 28.

Equally as important, HughGM gave Long the authority and ability to carry out all of the conduct at issue in this case.  Long was a principal in fact of HughGM, and was advertised by HughGM as a principal to the commissioning marketplace.  Long was listed as a HughGM "Principal" on HughGM's website, and as an "owner leader" in HughGM's marketing materials. *See* Exh. 27 (HughGM website from December 2014); Hugh Opp., Dkt. 28 at 3 (conceding that "Robert Long was designated as a 'principal' on HughGM's website"); Exhs. 6 & 17 (similar marketing materials sent seeking business in Indianapolis, Indiana and St. Louis, Missouri).  In both places, Long was featured prominently in the second position, behind only Amburn.  (Now that CAI has filed this lawsuit and uncovered Long and HughGM's fraud, HughGM has removed Long from its website.)  Long was given a HughGM email account that he used to send and receive thousands of emails.  Long's signature block on this account (from which Long routinely sent emails to Amburn) indicated that Long was a "Principal" of HughGM.  Long sent emails to industry contacts from this account wherein he described himself as a HughGM principal— Amburn was aware of and approved all of these emails, as he was copied on all of them.  *See* Exh. 6 ("Our company (Hugh Cx) consists of (4) principals: . . . . 4. Myself – mechanical engineer – over 20 years of experience").  Long was even a part-owner in HughGM (although he and Amburn may have tried to conceal this fact from other HughGM members), and had significant authority over the direction of the company.  *See* Exh. 28 (May 28, 2014 Amburn email to Long: "Let's say that there is $100k profit at year end. Right now it would be $55k me [Amburn] / *$45k you [Long]* . . . . It may be smart for you to make a capital investment or *'buy' from me as some bogus, undisclosed Brother discount* . . . . Voting: . . . . It is working well now with *you and I forcing each other to agree/disagree until we['] re on the same page*.").  In short, Long carried out the acts at issue in this case on behalf of HughGM, HughGM provided Long

11

with the authority to commit those acts, and HughGM encouraged, participated in, and welcomed the benefit of those acts.

## ARGUMENT

### I.       Standard and Burden of Proof

CAI bears the burden of demonstrating that personal jurisdiction exists.  *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).  But unless the court holds an evidentiary hearing,[3] then CAI need only establish a *prima facie* for personal jurisdiction.  *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012); *Howell v. Clark Cty. Collection Serv.*, LLC, 2015 WL 1210599, at *1 (S.D. Ind. Mar. 16, 2015).  The Court must "accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff."  *Felland*, 682 F.3d at 672 (citing *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)); *see also Enviroplan, Inc. v. W. Farmers Elec. Co-op.*, 900 F.Supp. 1055, 1059 (S.D. Ind. 1995) (the Court must "construe all facts concerning jurisdiction in favor of the non-movant, including disputed or contested facts.") (citing *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215 (7th Cir. 1984)).

---

[3] While oral argument may aid the Court's decision on personal jurisdiction, an evidentiary hearing is not warranted.  Defendants have now let pass several opportunities to adduce reliable evidence in this case.  CAI filed its complaint, which contained detailed allegations supported by over 100 pages of exhibits.  Defendants responded with their motions to dismiss, each supported only by one short affidavit, which in turn contained highly dubious assertions on which Defendants' motions relied.  CAI therefore asked Defendants to consent to limited jurisdictional discovery.  Defendants refused.  Seeking compromise, CAI then asked Defendants to consent only to limited discovery on the issue of venue.  Defendants again refused.  CAI then filed a motion for limited venue discovery.  Defendants withdrew their venue arguments.  In short, Defendants have passed on multiple opportunities to adduce facts beyond the conclusory, self-serving statements in their respective affidavits, and therefore they should not be afforded yet another chance to substantiate their position.

## II.    The Federal RICO Statute Provides for Nationwide Personal Jurisdiction.

Congress can provide for nationwide personal jurisdiction.  Thus, the necessary first step in any personal jurisdiction analysis is to look to the federal statute at issue to determine Congress' intent.  *See Felland*, 682 F.3d at 672 (beginning personal jurisdiction by checking to see whether any "federal statute authorizes nationwide service of process in this case" before determining whether it should look to "the law of the forum state"); *Howell*, 2015 WL 1210599, at *1 (same) (citing, *inter alia*, *United States v. De Ortiz*, 910 F.2d 376, 382 (7th Cir. 1990) ("To determine whether a defendant is amenable to service in a federal question case, we look to the applicable federal statute.")).  Defendants completely ignore the content of the RICO statute, which provides for nation-wide personal jurisdiction.

CAI has asserted claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against both Long and HughGM.  *See* Compl. 35-38 ¶¶ 148-164 (COUNT XII).  Section 1965(d) of the RICO statute establishes nationwide jurisdiction over the RICO defendant regardless of whether that or any defendant has minimum contacts with the forum state.  *See Robinson Engineering Co. Pension Plan & Trust v. George*, 223 F.3d 445, 449-50 & n.1 (7th Cir. 2000) (noting that RICO § 1965(d) "authorize[s] nationwide service of process" and only requires compliance with a state's long-arm statute to establish personal jurisdiction if defendant is beyond the United States' borders; Illinois would have had personal jurisdiction over defendant despite his lack of Illinois contacts had he been found in the United States; because defendant was served in Canada, Illinois had such jurisdiction "at least" because of worldwide service of process under similar federal securities laws and supplementally for RICO because of similarity of underlying conduct at issue); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (finding personal jurisdiction despite insufficient minimum

contacts with the forum because RICO's jurisdiction provision "evidenc[es] Congress' desire that '[p]rovision [be] made for nationwide venue and service of process'") (citing 18 U.S.C. § 1965(d) & H. Rep. No. 91–1549, at 4 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4010)); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) (court "need not pause long" over question of whether RICO confers jurisdiction over a defendant because RICO "provides for nationwide service of process [and therefore] it becomes the statutory basis for personal jurisdiction" in any district court; "[b]ecause the [defendants in question] are domestic corporations doing business in this country, the statutory basis for personal jurisdiction over these defendants is satisfied"); *see also Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 807 & n.3 (7th Cir. 2002) (analyzing similar provision in ERISA 29 U.S.C. § 1132(e)(2): "Section 1132(e)(2) provides for nationwide service of process that simply requires minimum contacts with the United States as a whole.  Therefore, the statute provides for nationwide personal jurisdiction" and establishes jurisdiction over the defendant "regardless of whether a court of the state encompassing the federal district could exercise personal jurisdiction over the defendant."); *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940-42 (7th Cir. 2000) (discussing whether RICO jurisdiction extends internationally: "the RICO statute['s] service of process provision, 18 U.S.C. § 1965(d), is similar to those of ERISA . . . . [t]he RICO and ERISA service of process provisions state that service may be made in 'any district,' which indicates that Congress authorized service only in the judicial districts of the United States and not worldwide"; Fed. R. Civ. P. "4(k)(1)(D) provides for jurisdiction whenever a statute explicitly authorizes service of process").[4]

---

[4] A recent unpublished case in Illinois notes that a "circuit split exists regarding whether RICO provides for nationwide service of process and personal jurisdiction in all circumstances or only if personal jurisdiction based on minimum contacts exists for at least one defendant."  *Gilman*

Where, as here, the federal statute at issue provides for nationwide service of process, any district court may exercise personal jurisdiction so long as doing so "comports with due process"—but those "limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *Republic of Panama*, 119 F.3d at 942. That means traditional "minimum contacts" analysis is irrelevant and Defendants must establish that litigating in the forum state will pose "such extreme inconvenience or unfairness as [to] outweigh the congressionally articulated policy of allowing the assertion of *in personam* jurisdiction" there. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d at 627 (quoting 4 Wright & Miller, § 1067.1, at 331 (1987): "congressional policy choice that includes nationwide service of process 'should be afforded substantial weight'"). More specifically, to avoid nationwide jurisdiction—and this Court's personal jurisdiction over them—Defendants must "look primarily to federal venue requirements for protection from onerous litigation, because it is only in **highly unusual cases** that inconvenience will rise to a level of constitutional concern." *ESAB Grp.*, 126 F.3d at 627 (citing, *inter alia*, *Republic of Panama*, 119 F.3d at 947 (in turn quoting *Asahi Metal Indus. v. Superior Ct. of Cal.*, 480 U.S. at 116, 1034 (1987) (Brennan, J., concurring in part and concurring in the judgment): "**only in 'rare cases'** will inconvenience become constitutionally unreasonable")) (emphasis added) (internal quotations omitted). To escape Congress' mandated

---

*Opco LLC v. Lanman Oil Co.*, 2014 WL 1284499, at *3 (N.D. Ill. Mar. 28, 2014) (cited cases to show that the Fourth and Eleventh Circuits side with the former, and the Second, Tenth, and D.C. Circuits side with the latter; not directly addressing issue because, unlike here, plaintiff did "not argue that the Court has personal jurisdiction over Defendants pursuant to § 1965"). But this case misses the instruction of *Robinson Engineering* and *Central States*, above, which thus puts the Seventh Circuit among those Circuits that find nationwide personal jurisdiction under RICO in all circumstances. *See Robinson Engineering*, 223 F.3d at 449-50 & n.1; *Central States*, 230 F.3d at 940-42. The *Gilman Opco* court's difficulty appears to be the confusion of RICO § 1965(*b*) (containing the prerequisite that it be "shown that the ends of justice require that other parties residing in any other district be brought before the court") with § 1965(*d*) (cited by the Seventh Circuit in both *Robinson Engineering* and *Central States*, above, and containing no such prerequisite).

establishment of personal jurisdiction, "'the burden is on the defendant' to show that the burden of distant litigation is so great as to put him at a 'severe disadvantage.'" *ESAB Grp.*, 126 F.3d at 627 (quoting *Republic of Panama*, 119 F.3d at 948).

Defending this case in Indiana will not pose such "extreme inconvenience or unfairness" to any Defendant. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d at 627. Indeed, all Defendants have withdrawn their objections to this Court as the proper venue if personal jurisdiction is found—and even that objection contained but one unexplained sentence of the supposed burden that Defendants would face by litigating in Indiana. *See* Dkt. 34 at 1 (finding that Defendants have expressly withdrawn this argument); Dkt. 11-2 (asserting without explanation that "[f]orcing the Defendants to participate in judicial proceedings in Indiana would impose unnecessary hardship on them").

Defendants' failure to show (or even argue) hardship here establishes personal jurisdiction under RICO's nationwide personal jurisdiction provision. That no Defendant even mentioned this facet of the RICO statute is both puzzling and telling. The RICO statute provides this Court with jurisdiction over Defendants and because CAI's state law claims derive from the exact same conduct as the RICO claim, this Court has supplemental jurisdiction over Defendants as to the entire Complaint. *Robinson Engineering*, 223 F.3d at 449-50 (retaining state law claims even "if the state's long-arm statute would not have provided for jurisdiction" over those claims, where they "ar[ose] out of the same nucleus of operative fact" as federal claims that established nationwide jurisdiction; "the same logic that lies behind the supplemental jurisdiction statute for purposes of subject matter jurisdiction . . . supports the application of supplemental personal jurisdiction") (citing 28 U.S.C. § 1367).

**II.    This Court Has Specific Jurisdiction Over Defendants Even Under a Traditional Minimum Contacts Analysis.**

Even if RICO did not establish personal jurisdiction over Defendants in this Court (and it does), Defendants have sufficient minimum contacts with Indiana to establish personal jurisdiction over them given the nexus between their contacts with Indiana and the facts and claims at issue in this case.

In addressing whether Indiana has personal jurisdiction over nonresidents, this Court undertakes a two-step analysis to ensure compliance with both Indiana's long-arm statute (Indiana Rule of Trial Procedure 4.4(A)) and due process under the Fourteenth Amendment.  But "[b]ecause Indiana's long-arm statute . . . 'reduce[s] analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the [f]ederal Due Process Clause,' the Court only needs to consider the second step of the analysis."  *Wine & Canvas Devel., LLC v. Weisser*, 886 F.Supp.2d 930, 938 (S.D. Ind. 2012) (quoting *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 967 (Ind. 2006)).

This Court has specific jurisdiction over all Defendants.  Unlike general jurisdiction, which requires a defendant to have "continuous and systematic contacts with the forum" irrespective of the substance of the underlying suit, *Noble Roman's, Inc. v. French Baguette, LLC*, 684 F. Supp. 2d 1065, 1070 (S.D. Ind. 2010), "a court's exercise of specific jurisdiction requires that the defendant's contacts with the forum state relate to the challenged conduct," *Felland*, 682 F.3d at 673 (7th Cir. 2012).  Analysis of whether a court has specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (internal quotations omitted).

Defendants make much of the fact that they do no business in Indiana, and that they have no presence or agents here.  *See* Dkt. 28 at 1, 3; Dkt. 11-2 at 2-3.  The first point, supported only

17

by Defendants' own affidavits, cannot be reconciled with the objective evidence showing that they have worked together to pursue business in Indiana, and indeed earn income via a consulting contract with an Indiana construction company.  Exhs. 17 & 18.

Defendants' second assertion is largely irrelevant.  Personal jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State . . . . it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *see also Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 283 (7th Cir.1990) (observing defendant "created a relationship which is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction")[5].

In the Seventh Circuit, specific jurisdiction analysis requires three things:

(1)     the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state;

(2)     the alleged injury must have arisen from the defendant's forum-related activities; and

---

[5] Defendants' assertions of a lack of business licenses in Indiana are similarly unavailing.  For one thing, this case is not about Defendants' lawful business activities in Indiana, but about their intentional, fraudulent actions directed here.  For another, Defendants' assertions are further irrelevant because the evidence of this case makes plain that Defendants have engaged in business in Indiana, and have pursued further such business.  *See* Exhs. 17 & 18. Moreover, MCC is not even registered to do business *in Washington*, where it purports to have its principal place of business.  *Compare* Dkt. 11-2 at 3 ("Mission Critical is a single member limited liability company organized under the laws of Nevada, which primarily has done business in Washington . . . . Mission Critical has never sought registration of its business in Indiana") *with* Exh. 30 (Washington state business search showing no record of MCC). This further supports the detailed allegations in CAI's Complaint that MCC is a sham corporation that Long created in hopes of disguising his illicit conduct, *see* Compl. 3-5 ¶¶ 15-19, and thus further supports CAI's allegations that Long and HughGM knowingly and intentionally directed a pattern of fraud, theft, and misappropriation into Indiana at CAI, while knowing that it would cause substantial injury to CAI in Indiana.

(3)    the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice."

*Felland*, 682 F.3d at 673 (7th Cir. 2012) (internal citations omitted).  This Court has personal jurisdiction over Defendants here.

### A.    Long and HughGM purposefully directed their illicit conduct at Indiana.

This first requirement is best explained in *Calder v. Jones*, 465 U.S. 783, 789 (1984).  *See Felland*, 682 F.3d at 674 ("the Supreme Court's important decision in [*Calder*] provides useful contours in conducting the purposeful-direction analysis in a tort case").

A defendant who "expressly aim[s]" his tortious conduct at a forum need not ever enter the forum to be subject to its jurisdiction.  *Calder*, 465 U.S. at 787, 789 ("The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects . . . . An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.").

The Seventh Circuit has "distilled three [subpart] requirements from *Calder* for determining whether conduct was 'purposefully directed' at the forum state: '(1) intentional conduct (or intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state."  *Felland*, 682 F.3d at 674-75 (quoting *Tamburo*, 601 F.3d at 703) (further internal quotations omitted).

As with RICO's nation-wide jurisdiction provision, Defendants do not mention *Calder* or its progeny, and for good reason: the standard articulated in *Calder* defeats their arguments. Long and HughGM purposefully directed their unlawful activity toward CAI in Indiana and

intended to cause it harm there since that is where CAI is located and does its competing business.

### 1.   Defendants' actions constitute intentional misconduct.

This first subpart requires little discussion: CAI's entire complaint alleges a pattern of deliberate and wrongful conduct, including fraud, theft, and misappropriation of CAI's trade secrets.  "These are intentional-tort allegations, bringing this case squarely within the *Calder* formula . . . ."  *Tamburo*, 601 F.3d at 704; *see also Felland*, 682 F.3d at 675 (first requirement "easily met" when plaintiff alleges "intentional misrepresentations").

### 2.   Defendants' expressly aimed their conduct at Indiana.

The second question—whether a defendant expressly aimed its conduct at the forum— covers what may be Defendants' greatest misunderstanding of the relevant law.  Defendants say that "all allegations in the Complaint pertain to the Defendants' conduct in . . . western states; primarily in **Washington**."  Dkt. 11-2 at 7 (emphasis in original).  But the case law is clear: theft, fraud, and misappropriation of trade secrets occur at the site of the *victim*, not the site of the thief.  By stealing CAI's proprietary information that was created and stored in Indiana, Long and HughGM subjected themselves to Indiana jurisdiction.  *See Felland*, 682 F.3d at 673 (false communications from plaintiff in Mexico to defendant in Wisconsin took place in Wisconsin for purposes of analyzing personal jurisdiction; district court's determination that such conduct occurred in Mexico constituted reversible error); *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 282 (7th Cir. 1990) (torts of misrepresentation and fraud occurred in Illinois where communications at issue were phone calls from Arkansas and New York to Illinois resident; district court's finding to contrary was reversible error); *FMC Corp. v. Varonos*, 892 F.2d 1308, 1313 (7th Cir. 1990) (jurisdiction proper where defendant sent

telexes and telecopies containing misrepresentations from Greece to Illinois resident; scheme to defraud an Illinois resident showed intent to affect Illinois interest); *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 37 (1st Cir. 1999) ("the actual conversion t[ook] place" in Antigua because "the bank accounts were depleted and the forfeited assets redirected" from there).

But a plaintiff need not even suffer such serious fraudulent misconduct (though CAI has) to establish jurisdiction.  A simple breach of contract will suffice where the defendant reaches out into the forum to contract with a plaintiff, and the defendant knows that his breach of that contract will cause harm to the plaintiff in the forum.  Here, Long purported to operate a modest one-man enterprise in Washington when he reached out to CAI to initiate an employment relationship.  *See* Ex. 2 at 3, 9.  He began his employment by visiting CAI for orientation and signing the Employment Agreement while there, the violation of which is integral to this lawsuit.  *See* Exh. 9.  And as described above, he constantly interacted with Indiana via timesheets, expense reports, reviews, and other correspondence regarding his work.  These are the exact facts of *Burger King*, where the defendant reached out to an established, out-of-state company, seeking benefits from a contractual relationship with that company.  The defendant "never even visited" the forum state, and his only contacts were a business partner's "brief training course" there; but by engaging in "ongoing," "continuous" contact with this franchisor, the defendant created a significant and intentional relationship.  471 U.S. at 465, 479-81.  And by "eschewing the option of operating an independent local enterprise, [defendant] deliberately "reach[ed] out beyond" his home state to obtain "the manifold benefits that would derive from affiliation with a nationwide organization."  *Id.* at 479-480 (internal quotation omitted).  Indeed, in *Burger King*, the defendant (unlike Long and HughGM) never even stole assets from the forum or sent fraudulent communications there; he simply failed to make contractually mandated payments.

*Id.* at 467.  Here, this contractual relationship, as well as the pattern of targeted fraud detailed above, establishes a firm connection between Long and HughGM, this suit, and Indiana.

In sum, Long aimed the following misconduct at CAI:

- Long conspired with fellow-HughGM officer Robert Evans to carry out a fraudulent scheme directed at Indiana company CAI.  To effectuate that scheme, Long initiated contact with CAI, held a meeting with CAI's Indianapolis-based CEO Robert Chew, and sent a fraudulent employment application to CAI's Indianapolis headquarters.  *Heritage House*, 906 F.2d at 282 (fraudulent communications directed into the forum from outside of it; injury suffered in forum because plaintiff "relied upon the misrepresentations" made in correspondence received in the forum); *FMC Corp.*, 892 F.2d at 1311-13 (defendant acted in reliance on plaintiff's representations).

- Long traveled to CAI's Indianapolis headquarters to initiate his employment.  While there, he signed an employment agreement that he intended to violate at the time he signed and it that he has repeatedly violated since.  *See Burger King*, 471 U.S. at 479-81 (finding personal jurisdiction in Florida where defendant knew he was entering an agreement with a Florida company and defendant's breach of that agreement caused foreseeable injury to plaintiff in Florida); *Nucor v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580-81 (7th Cir. 1994) (affirming finding of personal jurisdiction where the defendant's only contact with the forum was one visit to negotiate a contract); *Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1193 (7th Cir. 1980), *cert. denied*, 449 U.S. 920 (1980) (finding personal jurisdiction where employee of defendant came to forum once for a lunch meeting which constituted bulk of contract discussion).

- Long retrieved proprietary materials from CAI's Indianapolis-run server, funneled them to HughGM, and helped HughGM to further misappropriate those materials and compete against CAI.  Exh. 19  *CoStar Realty Info., Inc. v. Meissner*, 604 F.Supp.2d 757, 772-73 (D. Md. 2009) ("a substantial  part of the events or omissions giving rise to the claim occurred" in Maryland in part because "the alleged fraudulent access took place on servers located in Maryland"); *Flowserve Corp. v. Midwest Pipe Repair, L.L.C.*, 2006 WL 265521, at *2-3 (N.D. Tex. Feb. 3, 2006) (jurisdiction established in Texas where Defendant "[w]hile using computers in Missouri, . . . aimed his alleged misappropriation of Confidential Information at servers located in Texas . . . . [plaintiff] stored its Confidential Information in Texas, the misappropriation occurred in Texas, and Flowserve's rights in the information were violated in Texas.") (citing *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1246 (10th Cir. 2000) (repeated unauthorized access of plaintiff's Oklahoma servers created personal jurisdiction in Oklahoma).

- Long sent emails to CAI CEO Robert Chew, with the intent to lull Chew into believing that Long was performing his duties, and to avoid discovery of the truth which would have led to his termination and thus the end of the fraudulent scheme.  Exh. 16  *See Felland*, 682 F.3d at 675-76 (finding personal jurisdiction over defendant where

defendant sent communications to forum state with purpose of lulling plaintiff into believing that contract was proceeding as planned and to avoid detection of fraudulent scheme; "Precedent has established that the use of the mails to lull victims into a false sense of security may be for the purpose of executing a scheme to defraud, even though the mailings were made after the money had been fraudulently obtained . . . . And such lulling communications are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging a fraud.") (citing *United States v. Brocksmith*, 991 F.2d 1363, 1367–68 (7th Cir. 1993); *United States v. Chappell*, 698 F.2d 308, 311 (7th Cir. 1983)) (quotation marks omitted).

- Long send fraudulent timesheets and expense reports via email to CAI's Indianapolis-based accounting department, with the purpose and effect of causing CAI to disburse to Long money for unearned wages and fabricated expenses from CAI's Indianapolis-based bank account. These transmissions to Indianapolis also had the purpose and effect of deceiving CAI CEO Robert Chew, who was responsible for Long's performance evaluations and determinations on retention and termination, and causing Chew to believe that Long was working significant hours on behalf of CAI's clients and to prevent Chew from discovering that Long was devoting essentially all of his CAI work time toward HughGM's interests. *See Felland*, 682 F.3d at 675-76 (lulling transmissions into forum state that prevent plaintiff from discovering already-underway fraudulent scheme establish personal jurisdiction in that forum state); *Master Tech Products, Inc. v. Smith*, 181 F. Supp.2d 910, 912 (N.D. Ill. 2002) ("The use of the mails to send communications to Illinois as part of a scheme to defraud an Illinois company can serve as a basis for personal jurisdiction") (citing *FMC Corp.*, 892 F.2d at 1314).

All of this conduct was done on behalf of and to advance the interests of HughGM, and done by a HughGM principal, owner, and authorized agent.

### 3. Defendants understood that their actions would harm CAI and that such harm would be felt in Indiana where CAI is located and does business.

Long and HughGM understood that their actions would cause injury to CAI in Indiana. Long knew CAI was an Indiana company with its principal place of business in Indiana. He signed an employment agreement expressly acknowledging that CAI's proprietary materials must be kept confidential, lest they be significantly devalued; he therefore understood that his actions would cause such loss of value, and understood that this loss would be suffered in Indiana, where the documents were created and stored and where the funds that they created

were collected.  He also knew that he was causing injury to CAI in Indiana by using those materials to help HughGM compete for projects against CAI, as it resulted in lost business and funds for CAI that otherwise would have flowed directly to CAI's corporate bank account in Indianapolis.  And he knew that his false timesheets and expense reports would cause CAI to suffer financial loss in Indiana, as his actions cause CAI to pay him significant sums of unearned money from its Indianapolis bank account.  *See Felland*, 682 F.3d at 675 (third requirement "easily met" where plaintiff knew of defendant's location and "directed multiple communications" there).

Although (as explained below) Long's knowledge here is enough to bind HughGM, Long's HughGM partners also knew that their conduct would injury CAI in Indiana.  Having seen and used numerous misappropriated documents, HughGM founder Amburn either knew or purposefully turned a blind eye to CAI's Indiana presence.  And HughGM partner Evans even participated in the very beginning of Long's specific targeting of CAI in Indiana and in HughGM's subsequent theft and misappropriation of those Indiana materials.

In short, Long intended to harm CAI by stealing its property and using that property to compete against it.  That kind of harm was not experienced in Washington.  Rather, it could only be felt by CAI in Indiana where it is headquartered.  Long and HughGM knew of this inescapable fact and indeed intended that very result.

**B.      CAI's injury arises out of Long's and HughGM's conduct toward Indiana.**

The Supreme Court has recently clarified that while the locus of the injury must be considered, the Court should focus on the nature of and intent of the Defendant's conduct.  "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *See Walden*, 134 S. Ct. at

24

1125 (2014).   For jurisdiction to lie over a defendant, the plaintiff's "claimed injury [must] evince a connection between" the defendant and the forum.   *Id.*

This analysis contains two key ingredients: (1) the "defendant *himself*," and not the "'unilateral activity'" of the plaintiff, creates his relationship with the forum state, and (2) the defendant creates that relationship not simply by "'random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State," but by "purposefully 'reach[ing] out beyond' their State and into another . . . ." *Walden v. Fiore*, 134 S. Ct. at 1121-23 (quoting *Burger King*, 471 U.S. at 475 and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984)) (emphasis in original) (United States Reporter citation pending). This *Walden* framework is not novel, and is wholly consistent with the preceding Seventh Circuit case law.   *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014), as corrected (May 12, 2014) ("*Walden* serves as a reminder that the inquiry has not changed over the years"); *compare Walden*, 134 S. Ct. at 1124 (conduct at issue limited to seizure of cash in Georgia and fraudulent communications sent from Georgia defendant to Georgia third-party recipient; defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [forum state] Nevada"); *Advanced Tactical*, 751 F.3d at 801-03 (defendant's connection to Indiana limited to nationwide "blast emails" that included some Indiana residents and passive website that made nominal sales into Indiana that were unrelated to subject matter of suit; case disposition would "be different if there were evidence that a defendant in some way targeted residents of a specific state" in which case the focus would properly be on "the deliberate actions by the defendant to target or direct itself toward the forum state") *and Howell*, 2015 WL 1210599, at *1 (no jurisdiction over defendant where plaintiff only moved to Indiana years after most of the relevant underlying events took place; defendant had no

25

knowledge that plaintiff had left Nevada and moved to Indiana and never contacted plaintiff while she was living in Indiana) *with Felland*, 682 F.3d at 675-77 (focus on defendant's conduct, not on plaintiff's location; defendant's actions not "attenuated" but were "expressly aimed at Wisconsin for the purpose of causing injury there") *and Tamburo*, 601 F.3d at 709 (defendants "expressly aimed their allegedly tortious conduct at [plaintiff] and his Illinois-based business for the purpose of causing him injury there . . . . the point of the purposeful-direction requirement is to ensure that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts with the forum state.") (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (7th Cir. 2008) (in turn quoting *Burger King*, 471 U.S. at 475) (quotation marks omitted).

Both elements are satisfied here.  As discussed above, CAI's injury arises out of Long's and HughGM's conduct expressly aimed at Indiana—the fraudulent application sent to Indiana, the trip to Indiana and the signing of the contract there, the targeting of CAI's Indianapolis bank accounts, the theft of proprietary materials from CAI's Indianapolis databases, the misappropriation that caused significant loss of value to CAI's Indiana-stored and Indiana-created material, and the transmissions to Indiana (of lulling correspondence and of falsified timesheets and expenses) for the purpose of concealing and continuing the fraud.  Long and HughGM carried out this conduct not just to victimize CAI, but to provide HughGM with an entrée to the Indiana commissioning and construction marketplace.  Those are not "random, fortuitous, or attenuated" contacts.  *See Walden,* 134 S. Ct. at 1123.  Nor are they, as Defendants would suggest, based on CAI's "unilateral activity."  *Id.*  That argument, in fact, makes no sense. CAI has not engaged in any "unilateral activity" relevant to the issues before the Court.  CAI has existed as an Indiana company, headquartered in Indiana since 1996.  Defendants targeted CAI

in Indiana for their unlawful acts.  *Contrast with Walden*, 134 S. Ct. at 1124 (all of plaintiff's acts directed to Georgia, not to Nevada forum).  CAI's decision to headquarter in Indiana—years prior to the conduct at issue here—is not "unilateral activity" for purposes of a personal jurisdiction analysis and has nothing to do with the facts underlying this lawsuit.  In short, *Defendants'* actions in and aimed at Indiana are the focus of this case, and those actions "were not just incidental but [we]re central to the fraudulent course of conduct alleged in the complaint."  *See Felland*, 682 F.3d at 677.

### C. The exercise of Indiana jurisdiction comports with traditional notions of fair play and substantial justice.

In determining whether due process permits personal jurisdiction, Courts consistently ask whether the defendant could have foreseen being sued in the forum— "'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"  *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S 286, 295 (1980) (ellipsis in original).

As discussed above, Long purposefully sought out the benefits of an association with Indiana, and signed an agreement in Indiana wherein he promised to keep confidential CAI's Indiana proprietary materials.  He cannot be surprised that his violation of this agreement has Indiana consequences, and that he must answer for them in an Indiana courtroom.  *See Burger King*, 471 U.S. at 479 (defendant's benefit derived from contractual association with the forum established jurisdiction over defendant when he violated the agreement).  And it is difficult to imagine that Long, as a principal of HughGM, could perpetrated a two-year fraud against an Indiana company by stealing its Indiana-created materials from their Indiana server and not be called to answer for these actions in Indiana.  Given the years-long pattern of misconduct that

27

Long and HughGM have directed at Indiana, and the significant benefit that Long and HughGM have enjoyed by stealing these materials from Indiana and misappropriating them to advance their financial interests, jurisdiction in Indiana is consistent with the traditional notions of fair play and substantial justice.

In assessing this issue, this Court often considers several factors: "(1) the burden on the defendants; (2) Indiana's interest in adjudicating the dispute; (3) plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies. *Wine & Canvas*, 886 F. Supp. 2d at 941 (S.D. Ind. 2012) (citing *Burger King*, 471 U.S. at 477). Recent cases from this Court have tended to focus on these first two or three factors. *See*, *e.g.*, *Wine & Canvas*, 886 F. Supp. 2d at 941-42; *Noble Roman's*, 684 F. Supp. 2d at 1072.

On the first factor, litigating this case in Indiana would pose minimal burden on Defendants. They have already shown the ability to effectively litigate this case in Indiana through the counsel they already have, and the evidence here shows that they do business in Indiana and intend to continue doing so. *See* Exhs. 17 & 18. These facts, coupled with the efficiencies of modern litigation, show that the burden of defending suit in Indiana would be little more than doing so in Washington. *See Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000) ("Easy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices, make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas."); *Noble Roman's*, 684 F. Supp. 2d at 1072 (citing *Burger King*, 471 U.S. at 474 for proposition that "modern transportation and communications mean it is

usually not unfair or too burdensome to require a party to defend itself in a state where it engages in economic activity").  Moreover, as discussed above, Defendants have specifically withdrawn all arguments on any burden that litigation in Indiana may cause them.  *See* Dkt. 34 at 1.  Therefore, "though it is always somewhat burdensome to defend a lawsuit away from home, it is not a burden that violates due process in this instance."  *Wine & Canvas*, 886 F. Supp. 2d at 941 (quoting *Noble Roman's,* 684 F.Supp.2d at 1072 (quotation marks omitted).

On the second factor, Indiana has significant interest in adjudicating this dispute. "Indiana has a genuine interest in affording its innocent citizens an opportunity to defend against the tortious acts of aliens and foreigners[.]" *JPMorgan Chase Bank, N.A. v. Desert Palace, Inc.*, 882 N.E.2d 743, 750 (Ind. Ct. App. 2008); *see also Anthem Ins. Companies, Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1240 (Ind. 2000) ("Indiana has an interest in seeing its residents and corporations protected from fraud.") (superseded by unrelated rule).  Further, "[b]ecause [CAI] is an Indiana company, [Indiana] clearly has an interest in obtaining convenient and effective relief, which is best accomplished in Indiana."  *Wine & Canvas*, 886 F. Supp. 2d at 942.  "Indiana citizens should expect to not have to leave their backyard to defend what is rightfully theirs."  *Desert Palace*, 882 N.E.2d at 750.  And this theme of course overlaps with the third factor, in that CAI of course has a strong interest in its access to "convenient and effective relief."  *See Wine & Canvas*, 886 F. Supp. 2d at 941.  The burden on CAI in litigating this case in Washington (as Defendants seem to prefer) would be no less than Defendants' burden in litigating here.  Accordingly, jurisdiction over Defendants in Indiana comports with the traditional notions of fair play and substantial justice.

As a final note: while skipping over statutory jurisdiction, Defendants did not mount a credible argument against specific jurisdiction.  They ignored the *Calder* line of cases altogether.

And between them, they applied law to facts here on exactly one case, from Colorado—but even this nonbinding case has no application here.  *See* Dkt. 11-2 at 7 (citing *Int'l Beauty Products, LLC v. Beveridge*, 402 F. Supp. 2d 1261 (D. Colo. 2005)).  As an initial matter, the Colorado district court in that case actually *found personal jurisdiction to lie over the Defendant* with respect to half the conduct at issue, which is applicable to and even less connected to the forum than the conduct this case; where the court found no personal jurisdiction, the Colorado court found (among many other distinctions from this case) allegations only of being paid by a forum company, and not pursuant to any contract or fraudulent correspondence into the forum.  In short, his nonbinding, inapplicable case cannot stand up against the ample law cited above.

**III.  HughGM Cannot Escape Liability by Asserting a Supposed Insufficient Connection with Long.**

In attempting to distance itself from Long's misconduct, HughGM ignores both the relevant case law and the facts of this case, which show their equal responsibility for the conduct described in the Complaint.

**A.  Long was a principal of HughGM, and therefore his actions were HughGM's actions.**

As alleged in CAI's Complaint, Long was a principal and part-owner of HughGM. Compl. 3, 8 ¶¶ 13, 32.  HughGM is therefore plainly liable for Long's actions (such as those alleged in this suit) taken in furtherance of HughGM's interests.  *See*, *e.g.*, *Cain Family Farm, L.P. v. Schrader Real Estate & Auction Co.*, 991 N.E.2d 971, 979 (Ind. Ct. App. 2013) (limited liability company liable for the acts of its members taken in carrying out the company's business); *see also Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir. 1987) (RICO enterprise is vicariously liable for the violations of its members under 18 U.S.C. § 1962(a) when the enterprise "has derived some benefit from the RICO violation").

30

Understanding this predicament, HughGM argues that it has no liability for Long's acts because Long was a mere "independent contractor." Dkt. 28 at 2-3. This assertion, supported only by Amburn's self-serving affidavit statement, Dkt. 28-1 ¶ 9, cannot be reconciled with the overwhelming objective evidence in this case:

- Long was listed as a "Principal" on HughGM's website, in second position behind HughGM founder George Amburn. Exh. 27.

- Long was listed as an "owner leader" on HughGM's marketing materials, again in second position behind Amburn. Exh. 6.

- Long was given a HughGM email account that he used to send and receive thousands of emails. *E.g.*, Exh. 6.

- Long's signature block for that account (from which Long routinely sent emails to Amburn) indicated that Long was a "Principal" of HughGM. *E.g.*, Exh. 6.

- Long solicited business with promotional emails (that copied Amburn) to various leads in the commissioning marketplace, wherein Long described himself as a HughGM "principal," on the same footing as Amburn. *E.g.*, Exh. 6.

- Long was a part-owner in HughGM with significant authority over the direction of the company. Exh. 28.

HughGM's only response to this evidence is its statement that "Robert Long was designated as a 'principal' on HughGM's website only because, at that time, he was believed to be an important part of the team—not because he had any actual ownership interest as contemplated by the legal term-of-art 'principal.'" Dkt. 28 at 3; Dkt. 28-1 ¶ 13. HughGM's only support for this contention is, again, a self-serving affidavit statement. When presented with the above overwhelming evidence—much of which was described and appended to CAI's Complaint—one would expect HughGM to be able to produce some shred of objective evidence to support its position, if that position were true. HughGM could not even produce the "contract" that established the supposed independent contractor status of the Long-HughGM relationship. Amburn's unsubstantiated affidavit statements cannot stand up against the wealth

of evidence of HughGM's own materials in this case.  In any event, because the Court must construe all facts in CAI's favor, *Enviroplan*, 900 F. Supp. at 1059, Long was a principal-in-fact of HughGM.

**B.    HughGM held out Long as its authorized agent, and is therefore responsible for Long's actions taken in that capacity.**

Even if somehow Long were not a genuine principal of HughGM (and he was), HughGM held him out as such.  It is indisputable (and indeed HughGM seems to concede) that Amburn wanted Long to appear to be a vital part of HughGM's business with the authority to act on its behalf.  Dkt. 28 at 3; Dkt. 28-1 ¶ 13.  (Long considered "an important part of the [HughGM] team").  Unfortunately for HughGM, this fact does not preclude its liability, but instead ensures it.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (addressing employee's intentional tort: "Scope of employment does not define the only basis for employer liability under agency principles.  In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment . . . . [such as when] the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority").

**C.    Regardless of Long's title, HughGM is liable for Long's actions because he acted on HughGM's behalf and those actions benefited HughGM.**

Regardless of what Long's title was or appeared to be, Long carried out conduct at issue here on behalf of HughGM and in furtherance of its interests.  Amburn knew of this conduct, accepted its benefits, and therefore ratified it on behalf of HughGM.  *See ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 821-22, 825-26 (N.D. Ill. 2008) (finding personal jurisdiction over defendants where principal failed to monitor agent and accepted benefit of

agent's fraud).  And even if Amburn did not accept and approve these actions (and he did), HughGM would still be liable for them.  As explained in *Burlington*:

> Section 219(1) of the Restatement [on Torts] sets out a central principle of agency law: A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.  An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment . . . .  The Restatement defines conduct, including an intentional tort, to be within the scope of employment when actuated, at least in part, *by a purpose to serve the [employer]*, even if it is forbidden by the employer.  For example, when a salesperson lies to a customer to make a sale, *the tortious conduct is within the scope of employment because it benefits the employer* by increasing sales, even though it may violate the employer's policies.

*Burlington*, 524 U.S. at 755-56 (internal quotations omitted) (emphasis added) (bracketed substitution in original).

HughGM's contention that it gained no benefit from Long's actions contains (again) no support—not even from Amburn's affidavit.  *See* Dkt. 28 ("Needless to say, HughGM and HughCx dispute any knowledge of or receiving any benefit from Long's alleged wrongdoing, which will be one of many issues to ultimately be determined in this lawsuit."); *see generally* Dkt. 28-1.  And it does not square with the documentary evidence presented here.  For example, HughGM's use of the stolen and misappropriated CAI proposal in its Boeing bid resulted in HughGM winning significant business from an ideal client.  *See* Exh. 31 (Long email to Amburn and other HughGM partners: "We have officially been selected to be a regional provider for [commissioning] for the Boeing Company . . . . WE ARE ONBOARD WITH BOEING!!!!!!").

### D.    Long could be an independent contractor and still bind HughGM by the actions at issue in this case.

As explained above, Long was not a mere independent contractor.  But even if he were, HughGM would still be responsible for his fraudulent actions because Amburn knew about and indeed encouraged them.  *See Meridian Fin. Advisors Ltd. v. Pence*, 2010 WL 2772840, at *11

(S.D. Ind. July 12, 2010) ("[T]he fact that Ray may have been an independent contractor of Meridian is of little significance.  Whether an independent contractor or employee, Meridian hired Ray to access information for it, knew that Ray accessed and retrieved [another's confidential information], and knew that Ray did not stop accessing" the confidential information after such access was discovered); *New Freedom Mortgage Corp. v. C & R Mortgage Corp.*, 2004 WL 783206, at *5-6 (N.D. Ill. Jan. 15, 2004) ("Even if Utz is an independent contractor working on behalf of C & R, C & R can still be liable for his fraudulent acts . . . . party who employs independent contractor may be liable for independent contractor's acts and omissions if party fails to use reasonable care in hiring contractor or directs contractor to commit act") (citation omitted).

In short, under any view of the facts, Long's actions at issue in this case bind HughGM, and therefore this Court has personal jurisdiction over HughGM.  *See, e.g.*, *Sabovcik v. Castillo*, 2009 WL 1285889, at *2 (N.D. Ind. May 5, 2009) ("'[T]he acts of an agent in a forum subject the principal to the personal jurisdiction of that forum state'"; intentional actions of plainclothes, off-duty Chicago police officer directed at Indiana plaintiff were sufficient to establish personal jurisdiction in Indiana over the City of Chicago under "effects doctrine" of *Calder v. Jones*) (quoting *Burkemper v. Waite*, 2007 WL 781658, *4 (N.D. Ind. March 12, 2007) (replacement in original)).

### E.    HughGM's liability does not depend on Long's conduct.

HughGM's attempts to insulate itself from Long's conduct, but ignores the conduct of Amburn, its purported sole member.  As explained above, Amburn routinely received materials and information that he knew to be illicitly obtained, and actively participated in the further misappropriation of those materials and the concealment of his and Long's scheme.  In short,

under any view of the facts and under any relevant legal theory, HughGM committed and is liable for the conduct at issue in this case, and therefore it is subject to personal jurisdiction in Indiana.

## CONCLUSION

For the foregoing reasons, this Court has personal jurisdiction over all Defendants, and therefore their motions should be denied.

Respectfully submitted,


Dated:        March 26, 2015             */s/ Christopher Bayh*

                                          T. Joseph Wendt
                                          Christopher Bayh
                                          **BARNES & THORNBURG LLP**
                                          11 S. Meridian Street
                                          Indianapolis, Indiana 46204
                                          Telephone:        (317) 236-1313
                                          Facsimile:        (317) 231-7433
                                          E-mail:        joe.wendt@btlaw.com
                                                            chris.bayh@btlaw.com

                                          *Attorneys for Commissioning Agents, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 26th day of March, 2015, a copy of the foregoing was filed electronically using the CM/ECF system and is available to all counsel of record using same.

*/s/ Christopher Bayh*        
