## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COMMISSIONING AGENTS, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00062-TWP-DKL |
| | ) | |
| ROBERT G LONG Individually, | ) | |
| HUGH GENERAL MANAGEMENT, LLC | ) | |
| doing business as HUGHCX; doing business as | ) | |
| HUGHGM, | ) | |
| HUGHCX, LLC doing business as HUGHGM | ) | |
| doing business as HUGH GENERAL | ) | |
| MANAGEMENT, | ) | |
| MISSION CRITICAL COMMISSIONING, | ) | |
| LLC doing business as HUGH GENERAL | ) | |
| MANAGEMENT doing business as HUGHCX | ) | |
| doing business as HUGHGM, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTIONS TO DISMISS

This matter is before the Court on Defendants, Robert G. Long ("Mr. Long") and Mission Critical Commissioning LLC.'s ("MMC") Renewed Motion to Dismiss for Lack of Personal Jurisdiction (Filing No. 30) and Defendants, Hugh General Management, LLC.'s ("HughGM") and HughCx, LLC.'s ("HughCx") Motion to Dismiss for Lack of Personal Jurisdiction and Alternative Joinder in Motion to Transfer Venue (Filing No. 27) (collectively, the "Defendants"). Plaintiff, Commissioning Agents, Inc. ("CAI") is a business that provides commissioning services. According to CAI, while employed for its business, Mr. Long lied to, defrauded, and stole from CAI for the benefit of himself and CAI's competitors. Specifically, CAI alleges that Mr. Long stole proprietary information and used it on behalf of a competitor, HughGM, worked simultaneously for HughGM without CAI's knowledge, and used CAI's proprietary information

to steal CAI's business for HughGM's benefit.  CAI further alleges that HughGM was aware of Mr. Long's double-dealing and either actively encouraged it or deliberately turned a blind-eye to it; and that Mr. Long falsified timesheets and expense reports that he submitted to CAI, resulting in CAI paying Mr. Long unearned wages and unjustified reimbursements.  In this lawsuit, CAI brings an array of claims against the Defendants, including: breach of contract and breach of fiduciary duties, actual and constructive fraud, tortious interference with business relationship, tortious and criminal conversion, theft and receiving stolen property, unjust enrichment, misappropriation of trade secrets, violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and Indiana's Corrupt Business Influence Act. The Defendants seek dismissal of all claims pursuant to Fed. R. Civ. P. 12(b)(2) based on lack of personal jurisdiction. For the reasons stated below, the Defendants' Motions to Dismiss are **DENIED**.

## I.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(2) requires dismissal of a claim where personal jurisdiction is lacking.  When a defendant moves to dismiss under Rule 12(b)(2), the plaintiff bears the burden of demonstrating the existence of jurisdiction.  *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997); *Wine & Canvas Dev., LLC v. Weisser*, 886 F. Supp. 2d 930, 937 (S.D. Ind. 2012) (J. Pratt).

When the court determines personal jurisdiction based only on reference to submissions of written materials, rather than based on evidence submitted at a hearing, a plaintiff simply needs to make a *prima facie* case of personal jurisdiction.  *Purdue Research Found.*, 338 F.3d at 782; *Wine*

*& Canvas Dev., LLC*, 886 F. Supp. 2d at 937.  In determining whether the plaintiff has met the

*prima facie* standard, the plaintiff is entitled to a favorable resolution of all disputed relevant facts.[1]

## II. BACKGROUND

Unlike the typical pleading-stage, motion to dismiss, the facts in the amended complaint

and affidavits are fairly well-developed and many are hotly-contested. Extrinsic evidence has been

incorporated in the background section. Where there are factual disputes, the Court has attempted

to note them by citing the opposing materials.  The Court is mindful that it must resolve all

competing factual inferences in favor of CAI, the non-moving plaintiff.  *See uBID, Inc. v.*

*GoDaddy Grp., Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010).  Moreover, as the plaintiff, CAI is

entitled to have any conflicts in the affidavits resolved in its favor.  *Turnock v. Cope*, 816 F .2d

332, 333 (7th Cir. 1987).

## A.    The Parties

### 1.    CAI

CAI, an Indiana corporation with its principal place of business in Indianapolis, runs its

accounting, human resources, marketing, administrative, data-management, and technology

functions out of Indianapolis.  In addition, its senior management, training facilities, and cloud-

based information technology center are all located in Indianapolis.

CAI is in the business of providing commissioning services, which include consulting,

engineering, and design services to ensure that a building is constructed to fit its intended purpose

and operates accordingly.  The commissioning industry bears some similarity to the construction

---

[1] If the defendant has submitted evidence in opposition to the implementation of jurisdiction, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research Found.*, 338 F.3d at 782-83.  Here, the Defendants submitted both affidavits and exhibits to oppose personal jurisdiction.  In response, CAI submitted abundant evidence in support of exercising jurisdiction, with no less than 31 substantive attachments to its response brief.  Accordingly, CAI's response brief satisfied its duty to offer additional evidence beyond the pleadings in support of personal jurisdiction.

industry in that clients put projects up for bid to qualified commissioning firms and award the business to the commissioning firm most suited to perform the work required, often based on the pricing information and technical ability manifested in a firm's proposal.  The commissioning firm hired to do the work is then responsible for ensuring that the work is completed on time.

Commissioning clients usually do not advertise publicly when they have a need for commissioning services.  Instead, clients typically announce their needs only to those firms with whom they have a prior relationship or with those firms that are known to have a strong reputation for quality work.  Commissioning firms, therefore, invest significant resources in cultivating strong relationships with prospective clients and in building a strong reputation through consistent, excellent work.

### 2.      **HughGM and HughCx**

HughGM and HughCx are both limited liability companies with their principal places of business in the state of Washington.  The sole member of HughGM is George H. Amburn, Jr. ("Mr. Amburn"), a resident and citizen of Washington; and the sole member of HughCx is HughGM, which is also a citizen of Washington.  Like CAI, HughGM is in the business of providing commissioning services for corporate clients.

### 3.      **Mr. Long and MMC**

Mr. Long is a resident of Washington.  Other than his three-day training in Indianapolis, Mr. Long has neither visited nor conducted business in Indiana.  MMC is a limited liability company, allegedly owned by Mr. Long, organized under the laws of Nevada, and primarily doing business in Washington.  MMC has never done any business in Indiana.

**B.**     **Mr. Long works concurrently for CAI and HughGM**

     **1.**     **Mr. Long is hired by CAI**

In October 2012, Mr. Long contacted Nathan Temple ("Mr. Temple"), CAI's Regional Manager for Washington, Oregon and California, regarding contract work in the Washington area. In response, Mr. Temple informed Mr. Long that CAI did not hire independent contractors but he was interested in talking to Mr. Long about full-time employment with CAI.

Over the course of the next two months, Mr. Long participated in numerous electronic and telephonic communications with CAI employees and attended two interviews, one in Bellevue, Washington and one in San Francisco, California. During the California interview, CAI's CEO, Robert Chew ("Mr. Chew"), met with Mr. Long and explained that CAI was headquartered in Indianapolis but had employees who primarily worked in customer project locations. About a month into the interview process, Mr. Temple e-mailed Mr. Long a copy of CAI's employment application, which Mr. Long completed and submitted back to Mr. Temple via e-mail. Mr. Long also submitted his application to CAI's Human Resources Development Director, Stephen Knoll, in Indianapolis.

On December 6, 2012, Mr. Chew extended a formal employment offer to Mr. Long via email. By the offer's terms, CAI would provide: (1) compensation of $39.00 per hour, plus overtime, which together provided an opportunity for Mr. Long to earn over $100,000.00 per year, depending on the number of hours he worked; (2) reimbursement of expenses incurred pursuant to travel that CAI might require for CAI work; and (3) other benefits such as paid vacation, medical insurance, company-funded retirement contributions, and a 401(k) savings plan. Mr. Long accepted the offer, and Mr. Chew emailed the entire company to share the news that Mr. Long had joined CAI's "West Coast team".

On December 10, 2012, Mr. Long began his employment at CAI.  Mr. Long traveled to Indianapolis for his initial training, where he signed an employment agreement with CAI.  By signing the agreement, Mr. Long explicitly acknowledged that CAI's proprietary information and materials belonged exclusively to CAI.  He further promised to keep those materials confidential and not to use them for his own benefit or the benefit of others.  Specifically, the employment agreement read, in significant part, as follows,

> Confidential Information[:] I am aware that during the course of my employment confidential information will be made available to me, for instance, product designs, employee/employment information, wage and salary data, marketing strategies, customer and employee lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of [CAI] and must not be given out or used outside of [CAI]'s premises or with non-[CAI] employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

Mr. Long personally returned the signed employment agreement to CAI's Human Resources department in Indianapolis.

Mr. Long served as a Commissioning Engineer for CAI, and was hired to effectuate growth and to service CAI's existing clients in the Pacific Northwest regions.  He worked from his home office in Bellevue, Washington and at on-site client facilities located in Washington, California, and Ireland.  Mr. Long states that he reported to Mr. Temple, who resided and was stationed in California.  (Filing No. 46-1 at 3.)  While acknowledging that he occasionally reported to Mr. Temple, CAI asserts that Mr. Long "was hired by, was fired by, was paid by, was evaluated by, submitted all work expenses to, and submitted all time reports to Indianapolis."  (Filing No. 38 at 6; Filing No. 38-1 at 2-6.)

### 2.      Mr. Long is hired by HughGM and is promoted externally as a "Principal" and "Owner Leader"

At some point during his employment with CAI, Mr. Long also began working for HughGM.   The parties dispute whether Mr. Long held an ownership interest in HughGM. However, the parties do not dispute that HughGM prominently and repeatedly held Mr. Long out to the public as a "Principal" and "Owner Leader".   For instance, Mr. Long was listed as a HughGM "Principal" on HughGM's website and as an "Owner Leader" in HughGM's marketing materials.   In both places, Mr. Long was featured prominently in the second position, behind only Mr. Amburn.   In addition, Mr. Long was given a HughGM email account, wherein the signature block indicated that Mr. Long was a "Principal" of HughGM.

HughGM asserts that the title "Principal" was not intended to designate ownership interest but, rather, was used "to identify Long and several others as experienced members of his client service team".   (Filing No. 43 at 3.).   Similarly, HughGM explains that the title "Owner Leader" was "intended to highlight Mr. Long's claimed industry experience as an [sic] construction and commissioning owner's representative, which is the outside consultant that assists the owner of a construction project".   (Filing No. 43 at 3-4.)   Instead, HughGM claims that it hired Mr. Long as an independent contractor.

Regardless of Mr. Long's actual position or purported ownership interest, he achieved some influence within HughGM; and the parties do not dispute that an ownership interest in HughGM was, at one point, discussed between Mr. Long and Mr. Amburn.   (*See* Filing No. 38-28) ("Let's say that there is $100k profit at year end.   Right now it would be $55k me [Mr. Amburn] / $45k you [Mr. Long]. . . . It may be smart for you to make a capital investment or 'buy' from me as some bogus, undisclosed Brother discount. . . . It is working well now with you and I forcing each other to agree/disagree until were [sic] on the same page.")

**C.**   **Mr. Long steals CAI's proprietary materials to benefit Mr. Long and HughGM**

According to CAI, during his employment, Mr. Long accessed CAI's proprietary materials, which were created and maintained in Indiana, and funneled them to HughGM.  In particular, upon accessing CAI's proprietary materials, Mr. Long delivered them to Mr. Amburn in order to steal business for HughGM.   Mr. Long acquired these materials by pulling them off of CAI's databases, which are cloud-based systems managed at CAI's Indianapolis headquarters.   These proprietary materials are essentially CAI's whole business, as they represent years of expertise and experience, toward which CAI has devoted significant resources.

CAI contends that Mr. Long used its proprietary materials to learn about and to steal business opportunities from CAI.   In support, CAI identifies several emails wherein Mr. Long appears to have sent confidential CAI emails to Mr. Amburn, related to CAI's conversations with potential clients regarding commissioning services.

In addition, CAI alleges that Mr. Long regularly used CAI's proprietary materials in HughGM bids.   In this regard, Mr. Long and Mr. Amburn worked together to change logos and other CAI-identifying content to give the appearance that HughGM had created them.   CAI alleges that HughGM submitted several proposals for commissioning services that were near-verbatim proposals that CAI had submitted for similar projects.   CAI additionally notes that the only changes that Mr. Long or HughGM made to the CAI proposals were changing the clients' names and substituting the CAI logo with the HughGM logo.   In support, CAI identifies at least one bid proposal, prepared on CAI-created documents and related to a prospective CAI bid proposal, that Mr. Long emailed to Mr. Amburn and that Mr. Amburn submitted on behalf of HughGM.

CAI also alleges that Mr. Long pursued new client leads on behalf of HughGM, despite being paid by CAI to pursue such leads on CAI's behalf.   In this regard, although the Defendants

8

vehemently deny doing business in Indiana, CAI identifies at least two Indiana-based commissioning contracts that HughGM won while Mr. Long was working for both CAI and HughGM.  (Filing No. 38-1; Filing No. 38-17; Filing No. 38-18.)

CAI further alleges that Mr. Amburn not only knew that the materials he received from Mr. Long were stolen from CAI, but that he actively participated in their further misappropriation by using them to pursue HughGM business.  In contrast, Mr. Amburn asserts that, if Mr. Long was stealing CAI proprietary materials on HughGM's behalf, he was unaware of it.

In this regard, CAI prominently points to a proposal that HughGM sent to Boeing, a CAI prospective client, seeking business for HughGM.  CAI contends that the submitted proposal was allegedly produced by Mr. Long on CAI proprietary materials.  (Filing No. 38-25 at 3.)  In particular, CAI points out that the HughGM bid proposal prominently displayed CAI's logo on every page and the document's text referred to work that "CAI" would provide.  (Filing No. 23 at 31-34.)

Apparently confused by the unexpected logo, a Boeing representative emailed HughGM for clarification of HughGM's relationship with CAI.  When asked, Mr. Long told Mr. Amburn that it was a "TYPO" and told Mr. Amburn to "[j]ust state that this plan was utilized on a project that Skanska and CAI was on.  (Filing No. 43-1 at 43.)  Thereafter, Mr. Long told the Boeing representative that HughGM was

> …not affiliated with [CAI].  In short, we were on a project with Skanska and CAI where the client wanted a very precise and complete Cx Safety Plan.  The Cx Safety plan was worked in conjunction with the GC (Skanska), client and other participants on the project (CAI). . . . As we were on the project and helped develop it – it is also our document.

(Filing No. 38-25 at 1-2.)  Mr. Long also shared this communication with Doug Brown and Allen Jafari at HughGM. (Filing No. 38-26 at 1-2.)   In addition, Mr. Amburn told the Boeing

representative, "[t]he basis of our plan was adopted from one of the better project safety plans of the past."  (Filing No. 38-26 at 2.)

According to CAI, the Boeing proposal and the emails that followed suggest that Mr. Amburn knew about Mr. Long's relationship with CAI.  Mr. Amburn and HughGM respond that the emails show that Mr. Amburn and HughGM were just as confused by the proposal as the Boeing representative and trusted Mr. Long's explanation.  (Filing No. 43-1 at 3-4.)

**D.**     **Mr. Long falsifies CAI employment records**

In addition, to stealing proprietary materials and business from CAI on behalf of HughGM, CAI alleges that Mr. Long lied on several employment forms, resulting in CAI paying him unearned salary and travel expenses.

**1.**     **Resume**

Mr. Long's employment application was rife with misrepresentations, including lies about his skills, experience, employment history, and criminal history.  These misrepresentations hid the fact that Mr. Long held positions with other commissioning firms and made Mr. Long appear qualified for the job when he was not.  Mr. Long does not directly rebut these allegations, but notes that he submitted his application to Mr. Temple, who is located on the West Coast.  (Filing No. 45-1.)

**2.**     **Timesheets and expense reports**

In addition, CAI alleges that Mr. Long sent inaccurate time and expense reports to CAI's Indianapolis office.  Specifically, Mr. Long sent over 80 fraudulent time reports and at least 22 separate fraudulent expense reports to CAI's Indianapolis headquarters, via an online program administered by CAI's Business Administrative Group.  In doing so, Mr. Long induced CAI's

business management staff in Indianapolis to pay him unearned wages and to reimburse him for unspent expense funds out of CAI's Indianapolis bank accounts.

When CAI's business administration staff discovered Mr. Long's fraudulent expense reports, CAI immediately terminated Mr. Long's employment with CAI.  CAI additionally presents signed admissions by Mr. Long regarding the false time sheets and expense reports. (Filing No. 38-11; Filing No. 38-12.)

Mr. Long similarly does not rebut these allegations but asserts that he was unaware that he was submitting his time and expense reports for final evaluation in Indiana.  (Filing No. 45-1.) CAI disputes this, however, and argues that Mr. Long was aware of the Indiana connection because he submitted his expense reports and weekly time reports to CAI's Indianapolis headquarters and because Mr. Long had several conversations with CAI's Indianapolis-based administrators about these reports.  (Filing No. 38-1 at 5-6; Filing No. 47-2.)

## III.  DISCUSSION

This lawsuit presents the difficult question of how closely connected a cause of action must be to a defendant's contacts with a forum to justify personal jurisdiction over the defendant in that forum.  Mr. Long and HughGM contend that dismissal is warranted because they do not reside or do business in Indiana and because they did not intentionally direct any alleged actions towards Indiana. CAI responds that the RICO statute provides for nationwide service of process, establishing personal jurisdiction over the Defendants; and argues that this Court should exercise pendent personal jurisdiction over the remaining state law claims.   In the alternative, CAI maintains that Mr. Long's alleged actions were sufficiently directed towards Indiana, and that Mr. Long acted as an agent of HughGM, thereby establishing specific personal jurisdiction over the Defendants through a traditional minimum contacts analysis.

Before the Court begins its analysis of the Rule 12(b)(2) motions, it must first address a number of preliminary matters that arose during briefing.

## A.   <u>Preliminary Matters</u>

First, although mentioned in the opening briefs of both motions to dismiss, the Defendants have since withdrawn their alternative request for convenience transfer, pending resolution of the personal jurisdiction issue.   (Filing No. 30 at 1; Filing No. 31 at 3 n.3; Filing No. 34 at 1-2.) Accordingly, this Court will not entertain that issue in this Order, though the Defendants are afforded leave to renew their motion at a later time.

Second, CAI did not respond to the Defendants' argument that general jurisdiction cannot be established over any defendant in this case.   The Court considers CAI's silence as assent and further agrees that this Court does not have general jurisdiction over the Defendants.   General jurisdiction is permitted only where the defendant has "continuous and systematic" general business contacts with the forum.   *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003).   Further, the Supreme Court recently clarified that general jurisdiction cannot be established solely upon "continuous and systematic" contacts with a forum state, but can only be established when a corporation's affiliations with the forum state are "so continuous and systematic as to render [the Defendant] *essentially at home in the forum State.*"   *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851, 2853-54 (2011) (emphasis added); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 758 n.11, 761 (2014); *Abelesz v. OTP Bank*, 692 F.3d 638, 656 (7th Cir. 2012); *NEXTT Sols., LLC v. XOS Techs., Inc.*, 71 F. Supp. 3d 857, 861-62 (N.D. Ind. 2014).   CAI does not allege that the Defendants are "essentially at home" in Indiana, and this Court agrees that they are not.

Third, CAI filed a Motion to Strike Long Defendants' New Rule 12(b)(6) Arguments or, in the Alternative, to Respond to those Arguments. (Filing No. 48.)  In their reply brief, Mr. Long and MMC attempt to raise a Rule 12(b)(6) challenge to CAI's RICO claims.  Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief.  *Autotech Technologies Ltd. Partnership v. Automationtion.com, Inc.* 249 F.R.D. 530, 536 (N.D. Ill. 2008).  Because new arguments and theories cannot be raised in a reply and because the Local Rules prohibit the filing of joint motions, the Court will not consider those arguments as part of the motion to dismiss.  However, Mr. Long is correct that Fed. R. Civ. P. 12(h)(2)(C) allows a 12(b)(6) motion to be made at any time, up to and including trial and he may do so here in a separate motion. As the parties know, the 12(b)(6) standard is "plaintiff friendly," thus many claims survive a motion to dismiss only to be disposed of on summary judgment. Given the procedural context of this case, the more prudent course might be to forego filing a separate 12(b)(6) motion.

Fourth, CAI also argues that Mr. Long's reply briefs present new arguments regarding its claim under the federal RICO Act, and therefore, these arguments should be stricken from the record.  Mr. Long contends, and the Court agrees, that the arguments presented in this regard rebut the arguments raised in CAI's response brief.  *Compare Rednour v. Wayne Twp.*, 51 F. Supp. 3d 799, 808-09 (S.D. Ind. 2014).  Accordingly, the Motion to Strike is granted in part and denied in part.  The Court **GRANTS** CIA's motion to strike the 12(b)(6) arguments and **DENIES** CAI's motion to strike the RICO arguments.

Finally, CAI argues that it should be permitted to file a sur-reply to rebut new arguments and evidence submitted in the reply brief.  As discussed, the Court does not consider the RICO Act arguments in the reply to be "new" and does not agree that additional argument is necessary

on this issue.  However, the Court considers it appropriate to allow CAI the opportunity to address new evidence, submitted by the Defendants for the first time as attachments to the reply briefs. Further, this Court notes that HughGM appears to have dropped its objection to the sur-reply, noting that the briefing costs in this case are already quite high.  (Filing No. 53 at 3.)  Consequently, this Court **GRANTS** CAI's motions to file a sur-reply.  (Filing No. 47.)  The Court will consider CAI's factual discussions therein but not the additional legal arguments.  (Filing No. 47-1.)

**B.**     **RICO Jurisdiction**

CAI argues that the RICO statute provides for nationwide service of process, establishing personal jurisdiction over the Defendants.  The Defendants respond that RICO does not provide for nationwide service of process in cases such as this, where all the Defendants are subject to the jurisdiction of the Western District of Washington.  CAI is correct that RICO authorizes nationwide service of process, but only if "it is shown that the ends of justice require that other parties residing in any other district be brought before the court."  18 U.S.C. § 1965(b); *Lisak v Merchantile Bancorp, Inc.*, 834 F.2d 668, 671-72 (7th Cir. 1987); *Master Tech Prods., Inc. v. Smith*, 181 F. Supp. 2d 910, 912 (N.D. Ill. 2002).  CAI attempts to get around this provision in the RICO statute by asserting that personal jurisdiction in this case is established under § 1965(d) rather than § 1965(b).  However, CAI fails to cite a single Seventh Circuit case which clearly supports this view and, instead, relies entirely on cases outside of the jurisdiction.  This is not persuasive; and, absent a showing of controlling precedent to the contrary, the Court must consider the ends of justice when determining personal jurisdiction under RICO.

In this case, there are several defendants, all of which reside and do business in Washington.  Because a district court in Washington would have jurisdiction over all the Defendants, the ends of justice do not require the Defendants' presence here.  *See Lisak*, 834 F.2d

at 671-72 (opining that the ends of justice did not require finding personal jurisdiction over a defendant in Illinois under RICO because a court in Indiana would have jurisdiction over both parties); *Master Tech Prods., Inc.*, 181 F. Supp. 2d at 912 (opining that the ends of justice did not require finding personal jurisdiction over a defendant in Illinois under RICO because a court in Texas would have jurisdiction over him).

Accordingly, because § 1965(b) does not authorize *unfettered* nationwide service of process as CAI suggests, the Court does not have personal jurisdiction over the Defendants under the RICO Act. As a result, CAI must, instead, demonstrate that the Defendants are subject to either general or specific personal jurisdiction in Indiana. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *Master Tech Prods., Inc.*, 181 F. Supp. 2d at 912.

## C.      **Specific Jurisdiction**

According to CAI, specific jurisdiction exists over Mr. Long because Mr. Long stole CAI's proprietary materials from Indiana and because he sent falsified time and expense reports to Indiana, causing significant harm to CAI in the forum state. In addition, CAI contends that specific jurisdiction exists over HughGM because it held Mr. Long out as an agent of the company and either actively encouraged Mr. Long's double-dealing or turned a blind-eye to it. Mr. Long responds that all of the alleged malfeasance occurred on the West Coast and was not intentionally directed at Indiana. HughGM responds that it does not do business in Indiana and was unaware of any wrongdoing by Mr. Long.

Where no federal statute authorizes nationwide service of process, personal jurisdiction is governed by the law of the forum state. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Fed. R. Civ. P. 4(k)(1)(A). Therefore, a district court must undertake and satisfy a two-step analysis in order to properly exercise personal jurisdiction over a non-resident defendant. *Wine &*

*Canvas Dev., LLC*, 886 F. Supp. 2d at 938.  First, the exercise of personal jurisdiction must comport with the state's long-arm statute; second, the exercise must comport with the due process clause of the Constitution.  *Purdue Research Found.*, 338 F.3d at 779.  Because Indiana's long-arm statute, Indiana Trial Rule 4.4(A), reduces the analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the federal due process clause, the Court only needs to consider the second step of the analysis.  *NEXTT Sols., LLC*, 71 F. Supp. 3d at 860; *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 967 (Ind. 2006).

Personal jurisdiction may be either specific or general.  *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1244 (7th Cir. 1990).  Specific jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *RAR, Inc.*, 107 F.3d at 1277; *Wine & Canvas Dev., LLC*, 886 F. Supp. 2d at 939.  In contrast, general jurisdiction exists for controversies neither arising out of nor related to the defendant's forum contacts, and it is permitted only where the defendant has "continuous and systematic" general business contacts with the forum state.  *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 415-16; *RAR, Inc.*, 107 F.3d at 1277.

Specific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of a general relationship between the parties.  *RAR, Inc.*, 107 F.3d at 1278 (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995)).  Rather, the action must directly arise out of the specific contacts between the defendant and the forum state.  *Id*.  A single contact with the forum state may satisfy the standard of minimum contacts if the contact produces a substantial connection with the forum state and the connection is related to the lawsuit.  *Wine & Canvas Dev., LLC*, 886 F. Supp. 2d at 941.  However, a defendant cannot be brought into a jurisdiction "solely as a result

of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475.

Accordingly, when evaluating the minimum contacts, courts are reminded that specific jurisdiction requires that the suit "arise out of" and "be related to" the minimum contacts with the forum state; and a court cannot simply aggregate all of the defendant's contacts with the state. *RAR, Inc.*, 107 F.3d at 1277-78 ("[u]nless [potential defendants'] conduct are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another."). This inquiry demands an assessment of the relationship among the defendant, the forum state, and the litigation. *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580 (7th Cir. 1994).

In sum, specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. *Burger King*, 471 U.S. at 472; *Tamburo*, 601 F.3d at 702. The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause. *Int'l Shoe Co.*, 326 U.S. at 316; *Tamburo*, 601 F.3d at 702; *RAR, Inc.*, 107 F.3d at 1277.

To begin, the Court notes that CAI's claims do not clearly arise out of the same nucleus of operative facts. Instead, because there appears to be two different types of "theft" alleged, it appears more accurate to separate CAI's claims into two factual groupings, the contract-based claims against Mr. Long which relate to the falsified timesheets and expense reports, and the RICO

and intentional tort claims against Mr. Long and HughGM which relate to the stolen proprietary materials.

This distinction is relevant because, although CAI asserts personal jurisdiction over all of the Defendants, CAI does not allege that all of the conduct is equally attributable to all the Defendants and the Defendants are named separately on several of the claims.  Further, the minimum contacts analysis is different depending on the types of claims alleged.  *See Tamburo*, 601 F.3d at 702; *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012).  In cases involving breach of contract claims, for instance, personal jurisdiction often turns on whether the defendant "purposefully availed" himself of the privilege of conducting business or engaging in a transaction in the forum state.  *Id.*  In cases involving intentional torts, however, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state.  *Id.*

### 1.   <u>Contract-based claims</u>

Regarding the contract-based claims which relate to the falsified timesheets and expense reports, Mr. Long argues that his only connections with CAI in Indiana are human resource-based interactions that he did not initiate.  Mr. Long contends that the bulk of his employment duties with CAI were limited to the Pacific Northwest and Silicon Valley regions of the United States. In particular, he notes that he was interviewed in Washington and California and that he was hired to effectuate growth and to service CAI's existing clients in the Pacific Northwest regions.  Mr. Long additionally notes that he worked from his home office in Bellevue, Washington and primarily reported to Mr. Temple, CAI's Regional Manager for Washington, Oregon and California.  In contrast, he argues that his only connection with CAI in Indiana was his initial training, shortly after being hired.

Because personal jurisdiction can only be established based on "[t]he defendant's conduct in relation to the forum state, [and] not unilateral actions of the plaintiff", a defendant-employee's human resources connections with the forum state are insufficient to establish personal jurisdiction. *See Protective Ins. Co. v. Cody*, 882 F. Supp. 782, 786-87 (S.D. Ind. 1995) (quoting *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 946 (7th Cir. 1992)); *Advanced Aerofoil Techs., Inc. v. Todaro*, No. 11-cv-7866, 2011 WL 6009616, at *4-5 (N.D. Ill. Nov. 30, 2011). This includes salary, reimbursement, and employment benefit payments made from forum-state bank accounts. *Id.*; *see also Int'l Beauty Prods., LLC v. Beveridge*, 402 F. Supp. 2d 1261, 1274-75 (D. Colo. 2005). Further, when the employment contract is negotiated outside of the forum state and the defendant-employee's working relationship centers around the plaintiff-employer's regional office rather than the employer's forum-state headquarters, personal jurisdiction is also not established. *See Protective Ins. Co.*, 882 F. Supp. at 786.

However, when a defendant-employee's communications, which would ordinarily be considered human resource-based, are used to effectuate a scheme to defraud the plaintiff-employer, those contacts are sufficient to establish personal jurisdiction. *See FMC Corp v. Varanos*, 892 F.2d 1308, 1313-1314 (7th Cir. 1990). For example, in *FMC Corp*, the Seventh Circuit rejected a defendant-employee's personal jurisdiction argument that her fraudulent invoices sent to the forum state via telex were insufficient to establish the requisite minimum contacts with the forum because the plaintiff-employer required her to submit such invoices. *Id.* In so concluding, the court noted that, although the employer required the employee to submit the invoices to the forum state, an otherwise involuntary act, the employer did not require the employee to submit communications containing misrepresentations, actions which formed the basis of the defendant's claim against her. *Id. See also RAR, Inc.*, 107 F.3d at 1278 ("specific

19

jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of a general relationship between the parties; rather, the action must *directly arise* out of the *specific contacts* between the *defendant* and the *forum state*") (emphasis added).

Ordinarily, this Court would agree with Mr. Long that his employment contacts with CAI in Indiana are primarily human resource-based and are, therefore, insufficient to establish personal jurisdiction over him in regards to CAI's contract-based claims.  However, CAI has alleged that Mr. Long sent over 80 fraudulent time reports and at least 22 fraudulent expense reports to CAI's Indianapolis headquarters during the course of his employment.  Mr. Long submitted the fraudulent time reports on a weekly basis and CAI presented documentary evidence to suggest that Mr. Long was aware that those reports were reviewed and approved in Indiana.

Assuming that these facts are true and resolving all inferences in favor of CAI, the Court considers this case to be closely aligned with *FMC Corp*.  Here, the facts suggest that Mr. Long used otherwise jurisdictionally-irrelevant, human resource-based communications to further his fraudulent scheme to defraud his defendant-employer.  CAI's contract-based claims directly arise from these specific contacts, which cannot be said to be involuntarily-made by Mr. Long. Accordingly, the Court finds that it has personal jurisdiction over Mr. Long with regards to CAI's contract-based claims against him, relating to his falsified timesheets and expense reports.

## 2.    RICO and intentional-tort claims

Determining personal jurisdiction over Mr. Long and HughGM for the RICO and intentional tort claims which relate to the stolen proprietary materials is a more complicated matter. Regarding the RICO and intentional tort claims, Mr. Long and HughGM argue that the alleged torts occurred outside Indiana and that neither CAI's principal place of business nor the place of felt-injury are sufficient to establish personal jurisdiction.  CAI argues that the effects of Mr.

20

Long's wrongdoing were felt in Indiana and the tortious actions were directed at CAI's business in Indiana, thus establishing personal jurisdiction over Mr. Long.   Moreover, CAI argues that agency principals establish personal jurisdiction over HughGM.

      **a.**      **Conduct "purposefully directed" at the forum state**

In cases involving intentional torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state.  *Tamburo*, 601 F.3d at 702; *Felland*, 682 F.3d at 674.  Such purposeful direction is established when the following factors are met: (1) intentional conduct (or intentionally and allegedly tortious conduct); (2) expressly aimed at the forum state; and (3) with the defendant's knowledge that the effects would be felt – that is, the plaintiff would be injured – in the forum state.  *Tamburo*, 601 F.3d at 703; *Felland*, 682 F.3d at 674-75.

The first and third prongs are easily met in this case.  As alleged in the Amended Complaint, Mr. Long intentionally stole CAI's proprietary materials to learn about and to steal business opportunities from CAI, and Mr. Long regularly used CAI's proprietary materials in HughGM bids.  Further, although Mr. Long claims that his work with CAI was exclusively limited to the Pacific Northwest, CAI submits sufficient evidence to suggest that Mr. Long knew CAI was an Indiana company.  In particular, CAI notes that its CEO, Mr. Chew, explained to Mr. Long that CAI was headquartered in Indianapolis during an employment interview; that Mr. Long submitted his application, time reports, and expense reports to Indianapolis; and that Mr. Long traveled to Indianapolis for his initial training where he signed and submitted the employment agreement with the confidentiality provision.  If Mr. Long did indeed steal CAI's proprietary materials, a fact this Court must assume as true for purposes of this motion, he did so knowing that his actions would harm an Indiana company.

The parties disagree on whether Mr. Long expressly aimed his tortious activities at Indiana. Both sides submit cases which would appear to support a finding either way and, admittedly, it is a close call. However, upon careful review, the Court finds that CAI's claims fall on the side of establishing personal jurisdiction.

In *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), the Supreme Court found personal jurisdiction over an out-of-state defendant who published an allegedly defamatory article against the plaintiff in the forum state. In so concluding, the Court found that personal jurisdiction was properly established based on the "effects" of the out-of-state defendants' conduct because the defendants "knew that the brunt of the injury would be felt by the [plaintiff] in the [forum state]." *Id*. Later, in *Walden v. Fiore*, the Supreme Court clarified its holding in *Calder* by emphasizing that the personal jurisdiction inquiry focuses not on the plaintiff's injury but on whether that injury shows a meaningful connection between the defendant and the forum state. 134 S. Ct. 1115, 1123-25 (2014); *see also Polymer Tech. Sys., Inc. v. Jant Pharm. Corp.*, No. 1:14-cv-01317-RLY, 2015 WL 1526058, at *6 (S.D. Ind. April 3, 2015). Focusing on the relationship between the allegedly tortious conduct and the forum state, the Seventh Circuit has articulated that there must be a forum state injury and the defendant must have either specifically directed his tortious conduct at the forum or acted with the purpose of causing harm in the forum state. *Tamburo*, 601 F.3d at 705-07 (discussing the facts of the case and the holding in *Janmark Inc. v. Reidy*, 778 F.2d 1200 (7th Cir. 1997)). From there, courts within the Seventh Circuit have divided.

The Defendants cite several cases wherein personal jurisdiction *was not* found over out-of-state defendants for injuries occurring to the forum-state plaintiffs. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014) (finding no personal jurisdiction in a trademark infringement case, wherein the defendant's only relevant

contacts with the forum state included the defendant's two blast emails sent to its customers nationwide and the defendant's posting of allegedly misleading information on its website that the defendant managed outside the forum state); *Polymer Tech. Sys., Inc.*, 2015 WL 1526058 (finding no personal jurisdiction in a patent infringement case, wherein the defendants' only relevant contacts with the forum state included the defendants' knowledge that the plaintiff had a related patent and that the plaintiff was headquartered in the forum state); *Centurion Serv. Grp., LLC v. SBMC Healthcare*, LLC, 944 F. Supp. 2d 617 (N.D. Ill. 2013) (finding no personal jurisdiction in a case involving a fraudulently obtained contract guarantee, wherein the defendants' only relevant contacts with the forum state included a single telephone call and a single email between the defendants and the plaintiff's attorney and the bulk of the contract negotiations occurred outside the forum state and the subject of the contractual agreement was located outside the forum state); *Advanced Aerofoil Techs., Inc.*, 2011 WL 6009616, at *4-5 (finding no personal jurisdiction in a conversion case involving stolen proprietary materials, wherein the defendants' only relevant contacts with the forum state included human resources contacts in the forum state and both the plaintiff's parent company and the plaintiff's technology servers were located outside the forum state and in the same forum as the defendants).

In contrast, CAI cites several cases wherein personal jurisdiction *was* found over out-of-state defendants for injuries occurring to the forum-state plaintiffs. *See Felland*, 682 F.3d 665 (finding personal jurisdiction in an intentional misrepresentation case, wherein the defendant's tortious contacts with the forum state included several "lulling" communications, via mail and email, to persuade the plaintiffs to continue to send money to the out-of-state defendant); *Tamburo*, 601 F.3d 693) (finding personal jurisdiction in a case involving defamation and tortious interference with business relations claims, wherein the defendants' tortious contacts with the

23

forum state included sending several defamatory emails to the plaintiff's customers and posting defamatory statements to the defendants' websites, which they managed out of state, urging customers to boycott the plaintiff's goods and services); *FMC Corp*, 892 F.2d at 1313-1314 (finding personal jurisdiction in a case involving RICO, fraud, and breach of fiduciary duty claims, wherein the defendant's tortious contacts with the forum state included sending multiple fraudulent invoices to the plaintiffs for payment via telex); *Heritage House Rests., Inc. v. Continental Funding Grp., Inc.*, 906 F.2d 276 (7th Cir. 1990) (finding personal jurisdiction in case involving a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, wherein the defendant's tortious contacts with the forum state included several defendant-initiated telephone conversations during which the defendant made significant misrepresentations to the plaintiff); *Master Tech Prods., Inc.*, 181 F. Supp. 2d 910 (finding personal jurisdiction in a RICO case, wherein the defendant's tortious contacts with the forum state included several telephone calls to the plaintiff in order to fraudulently obtain confidential business information from the plaintiff).

What divides these cases factually is the type of claim alleged and the extent of the defendants' activities in furtherance of the wrongful actions.  For instance, the cases finding personal jurisdiction all involved a fraud-based claim or a tortious interference with business relations claim.  In contrast, in two of the cases not finding personal jurisdiction, the cases involved claims of trademark and patent infringement.  In cases where the defendants' forum state contacts, made in relation to the tortious actions, were minimal, courts did not find personal jurisdiction. Further, in cases where the defendants' forum state contacts, made in relation to the tortious action, were more extensive, the court found personal jurisdiction.  Additionally, in the cases finding personal jurisdiction the defendants' forum state activities occurred more than once and were clearly made in furtherance of the alleged wrongdoing.

The Court does not consider it mere coincidence that, in cases involving fraud-based claims and more aggressive actions by the defendants in pursuit of their wrongful actions, courts more frequently found that the plaintiffs' claims directly arose from the defendants' actions and found that defendants intentionally directed their activities at the forum state with the intent to harm the forum-state plaintiffs.

In this vein, the Court notes that CAI's claims against Mr. Long and HughGM primarily involve fraud-based claims, including claims of breach of fiduciary duties, actual and constructive fraud, tortious interference with business relationship, tortious and criminal conversion, theft and receiving stolen property, unjust enrichment, misappropriation of trade secrets, and violations of RICO and Indiana's Corrupt Business Influence Act. The Court considers the alleged conduct by Mr. Long and HughGM in furtherance of Mr. Long's wrongful actions to be particularly aggressive. Mr. Long and HughGM had access to CAI's business leads and proprietary materials directly because of Mr. Long's employment with CAI, an Indiana company. Without a doubt, CAI never would have released such materials to Mr. Long, had he not signed and submitted his employment agreement which included confidentiality provisions, which Mr. Long submitted while in Indianapolis during his employee training. Further, Mr. Long's access to CAI's proprietary materials was exclusively through CAI's servers, which are exclusively managed from CAI's headquarters in Indianapolis.

Given the nature of CAI's business, these actions are not insignificant. Importantly, CAI contends that its proprietary materials are "essentially CAI's whole business" and "represent years of expertise and experience, and represent CAI's significant commitment of resources (financial and otherwise) to the creation and development." Further, it is undisputed that commissioning clients usually do not advertise publicly when they have a need for commissioning services but,

instead, announce their needs only to those firms with whom they have a prior relationship or with those firms that are known to have a strong reputation for quality work.

As such, Mr. Long's seemingly minimal forum-state actions of logging on to a CAI server and downloading confidential proprietary information have a significant jurisdictional impact, as this singular act, which was facilitated by Mr. Long's employment with CAI, potentially stole "CAI's whole business."  The Court does not agree with Defendants that this is mere hyperbole. CAI has presented evidence that Mr. Long and HughGM used the stolen proprietary information to steal significantly-valued contracts with Boeing, Microsoft, and other "Fortune 100 clients".   If proven, the injury to CAI in Indiana is unquestionably substantial.  Moreover, Mr. Long's contacts with CAI in Indiana, as CAI's employee, is precisely what made his alleged scheme of fraud possible.  Accordingly, Mr. Long must be held to have purposefully directed his tortious activities at Indiana.

The Court further agrees with CAI that this Court also has personal jurisdiction over HughGM based on Mr. Long's minimal contacts with Indiana, as Mr. Long is alleged to have served as HughGM's agent throughout the alleged course of wrongdoing.  "The acts of an agent in a forum subject the principal to the personal jurisdiction of that forum state."  *Sabovcik v. Castillo*, No. 2:08-CV-279, 2009 WL 1285889, at *2 (N.D. Ind. May 5, 2009).

In this regard, HughGM's fervent argument that Mr. Long was an independent contractor and never had an ownership stake in the company, is well taken.  However, HughGM is notably silent in response to CAI's assertions that, regardless of Mr. Long's actual ownership status, he served as an agent of HughGM.  In particular, CAI notes that HughGM prominently promoted Mr. Long to the outside world as both a "Principal" and "Owner Leader" on its website and marketing materials and in Mr. Long's email signature block.  Indeed, HughGM admits that Mr. Long was

intentionally promoted in this way "to highlight Mr. Long's claimed industry experience as an [sic] construction and commissioning owner's representative, which is the outside consultant that assists the owner of a construction project".

Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from the agent's principal. *Rogers v. Sigma Chi Int'l Fraternity*, 9 N.E.3d 755, 764 (Ind. App. 2014); *Cain Family Farm, L.P. v. Schrader Real Estate & Auction Co.*, 991 N.E.2d 971, 977 (Ind. App. 2013). If, because of the principal's manifestations, a third party reasonably believes that in dealing with the apparent agent he is dealing with the principal's servant or agent and exposes himself to the negligent conduct because of the principal's manifestations, then the principal may be held liable for that negligent conduct. *Rogers*, 9 N.E.3d at 764. The necessary manifestation is one made by the principal to a third party, who in turn is instilled with a reasonable belief that another individual is an agent of the principal. *Rogers*, 9 N.E.3d at 764; *Cain Family Farm, L.P.*, 991 N.E.2d at 977. The "manifestations" need not be in the form of direct communications, but rather the placing of the agent in a position to perform acts or make representations that appear reasonable to a third person is a sufficient manifestation to endow the agent with apparent authority. *Rogers*, 9 N.E.3d at 764. Whether there is an agency relationship is generally a question of fact. *Rogers*, 9 N.E.3d at 764; *Cain Family Farm, L.P.*, 991 N.E.2d at 977. Further, a principal will be bound by the acts of a principal's agent regardless of the agent's lack of authority if the principal subsequently ratifies the agent's conduct. *Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'r and Land Surveyors, Inc.*, 852 N.E.2d 27, 33-34 (Ind. App. 2012) ("Corporations act only by and through their officers and agents, and ratification may be inferred from affirmation, acquiescence or from the receipt of benefits with knowledge.")

Assuming, as the Court must do, that CAI's alleged facts are true and drawing all inferences in CAI's favor, HughGM appears to have held Mr. Long out as an agent with, at least, apparent authority. Indeed, the Court does not know of a more strident factor to demonstrate agency, other than changing Mr. Long's title from "owner" and "principal" to "agent". This may be why HughGM choose not to address whether an apparent agency relationship existed in its reply briefs. Further, even if Mr. Long was not HughGM's agent, CAI submitted significant facts to demonstrate Mr. Amburn's potential ratification of Mr. Long's stolen proprietary materials via the emails related to HughGM's bid proposal to Boeing. Specifically, when a Boeing representative questioned Mr. Amburn about a HughGM's bid proposal, because the proposal was littered with CAI logos and references to CAI's work, both Mr. Long and Mr. Amburn told Boeing a most-curious answer, that HughGM created the document on a joint project with CAI and another commissioning company. Thereafter, HughGM won the contract with Boeing, a potential client of CAI. Drawing all inferences in CAI's favor, such facts support the conclusion that either Mr. Amburn promoted Mr. Long's alleged wrongdoing with respect to the Boeing contract or that Mr. Amburn ratified the wrongdoing by furthering Mr. Long's misrepresentation to third parties and by accepting the benefits of Mr. Long's actions on HughGM's behalf.

Regardless, the Court recognizes that this is merely the pleading stage, and questions of the existence and scope of an agency relationship are questions of fact. *Rogers*, 9 N.E.3d at 764; *Cain Family Farm, L.P.*, 991 N.E.2d at 977; *Quality Foods, Inc.*, 852 N.E.2d at 33-34. Instead, at this stage, it is sufficient that CAI has established a *prima facie* case of jurisdiction. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 822-23 (N.D. Ill. 2008). Resolving all factual issues in CAI's favor and noting that personal jurisdiction over an agent is sufficient to establish personal

jurisdiction over the principal, the Court finds that it also has personal jurisdiction over HughGM in relation to CAI's RICO and intentional tort claims.

### b.   Injury "arises out of" the defendant's contacts with the forum state

Even where a defendant's conduct is purposefully directed at the forum state, the plaintiff must also show that the injury "arises out of" or "relates to" the conduct that comprises the defendant's contacts. *Burger King*, 471 U.S. at 472; *Felland*, 682 F.3d at 676-77; *Tamburo*, 601 F.3d at 702, 708-09. This is easily established, as the Court has already concluded that but for Mr. Long stealing CAI's proprietary materials from CAI's servers in Indianapolis, there would be no injury and no intentional tort claims against Mr. Long or HughGM. As already explained, it is precisely Mr. Long's contacts with CAI in Indiana, as CAI's employee, that made his alleged scheme of fraud possible.

### c.   Traditional notions of fair play and substantial justice

Finally, the Court must determine whether the exercise of personal jurisdiction over an out-of-state defendant would offend traditional notions of fair play and substantial justice. *Int'l Shoe Co.*, 326 U.S. at 316; *Felland*, 682 F.3d at 677-78; *Tamburo*, 601 F.3d at 702, 709-10. The following factors are relevant in making this determination: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477; *Felland*, 682 F.3d at 677; *Tamburo*, 601 F.3d at 709.

Indiana has a strong interest in providing a forum for its local business's to seek redress for tortious injuries inflicted by out-of-state actors and suffered within the state. While Mr. Long and

HughGM may face some burden in being forced to defend an action in Indiana, their burden is no different than any out-of-state defendant and there is no suggestion that their hardship will be any greater than that routinely tolerated by courts exercising specific jurisdiction over non-residents.

Accordingly, since the alleged tortious behavior was purposefully directed at Indiana, CAI's injuries arose out of the Defendants' tortious conduct with Indiana, and exercising personal jurisdiction over the Defendants does not offend traditional notions of fair play and substantial justice, the Court finds that it has specific personal jurisdiction over the Defendants.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court concludes that it has personal jurisdiction over both Mr. Long and HughGM, and therefore, the Defendants' Motions to Dismiss For Lack of Personal Jurisdiction (Filing No. 27, Filing No. 30) are **DENIED.**  Further, CAI's Motions to File a Sur-Reply (Filing No. 47) is **GRANTED.**   Finally, CAI's Motion to Strike (Filing No. 48) is **GRANTED in part and DENIED in part**.

**SO ORDERED.**

Date: 10/29/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana


DISTRIBUTION:

Christopher J. Bayh
BARNES & THORNBURG LLP (Indianapolis)
cbayh@btlaw.com

T. Joseph Wendt
BARNES & THORNBURG LLP (Indianapolis)
jwendt@btlaw.com

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

TaKeena Monette Thompson
COHEN & MALAD, LLP
tthompson@cohenandmalad.com

Michael Wesley McBride
COHEN & MALAD LLP
mmcbride@cohenandmalad.com

Joshua B. Fleming
QUARLES & BRADY LLP (Indianapolis)
josh.fleming@quarles.com

Michael A. Rogers
QUARLES & BRADY LLP (Indianapolis)
michael.rogers@quarles.com